9 F.3d 958
 Edwin E. HODGES and Susan E. Hodges, as Legal
Representatives of the Estate of Kara Elizabeth
Hodges, Deceased, Petitioners-Appellants,
v.
SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES,
Respondent-Appellee.
 No. 92-5089.
 United States Court of Appeals,
Federal Circuit.
 Nov. 15, 1993.
 
 Boyd McDowell, III, McDowell, Moll, Fitzgibbons & Drew, Ltd., of Chicago, IL, argued for petitioners-appellants.
 Charles R. Gross, Dept. of Justice, Washington, DC, argued for respondent-appellee. Stuart M. Gerson, Asst. Atty. Gen., Helene M. Goldberg, John Lodge Euler and Mary Hampton Mason, Attys., Dept. of Justice, Washington, DC, were on the brief, for respondent-appellee.
 Before NEWMAN, Circuit Judge, SMITH, Senior Circuit Judge, and PLAGER, Circuit Judge.
 PLAGER, Circuit Judge.
 
 
 1
 Edwin and Susan Hodges petitioned for compensation under the Vaccine Act[1] on behalf of their daughter, Kara Hodges, who died within 3.5 hours of receiving a DPT (diphtheria-pertussis-tetanus) vaccination. The Hodges appeal the Court of Federal Claims'[2] (CFC's) judgment, No. 90-551V (Jan. 24, 1992), which upholds the special master's denial of compensation. We affirm.
 
 
 2
 Kara Hodges was born on December 2, 1982 and was a healthy baby. She received her first DPT shot on February 23, 1983 at around 2:45 pm. She had two screaming and crying episodes that afternoon; during the second episode, her mother put her in the crib to cry herself to sleep. When her mother checked Kara some thirty to forty-five minutes later, she was limp, pale, unresponsive and not breathing. She was taken to the hospital by ambulance, but she could not be revived and was pronounced dead at 6:31 pm. After autopsy, Sudden Infant Death Syndrome (SIDS) was listed as the cause of her death.[3]
 
 
 3
 On June 20, 1990 the Hodges filed a petition for compensation. The petition alleged that Kara suffered a hypotonic-hyporesponsive collapse (HHC), a table injury under 42 U.S.C. Sec. 300aa-14(a)(I)(C), within 3.5 hours after the DPT vaccination. The Hodges submitted affidavits from two experts. One opinion stated that an HHC was evidenced by the state in which she was found--pale, limp, unresponsive and in cardiac and pulmonary arrest. The other stated that Kara must have suffered an unwitnessed HHC, resulting in death, while she was in her crib.
 
 
 4
 Respondent Health and Human Services (HHS) opposed the petition. HHS' expert stated that there was no evidence of an HHC prior to death. On August 14, 1991 the special master denied compensation. Hodges v. Secretary of Dep't of Health & Human Servs., No. 90-551V, 1991 WL 169397 (Cl.Ct.Spec.Mstr.). He found that the Hodges had not proven a table injury. Their experts' opinions were based on the fact of death alone; although Kara suffered symptoms not unlike HHC as part of death, death per se is not a compensable table injury.
 
 
 5
 The special master also found that the Hodges had not proven actual causation. The temporal relationship of Kara's death to the vaccine administration, alone, did not establish causation. One of petitioners' experts failed to offer specific support for his opinion that the DPT vaccine caused Kara's death; he merely attached articles showing that DPT vaccination can cause death. The other expert opined that her death was caused by a reaction to endotoxin in the vaccine, but the special master found that the medical evidence failed to support this theory.
 
 
 6
 The Hodges filed a motion for review. The CFC upheld the special master's findings on January 24, 1992. The Hodges then appealed that judgment here.
 
 DISCUSSION
 
 7
 We review the judgment of the CFC under a highly deferential standard with regard to factual matters. On the other hand, questions of law such as statutory interpretation, are subject to complete and independent review by this court. See Trayco, Inc. v. United States, 994 F.2d 832, 835 (Fed.Cir.1993) (conclusions of law subject to complete and independent review); see also In re Sure-Snap Corp., 983 F.2d 1015, 1017 (11th Cir.1993). We may not disturb the judgment of the Court of Federal Claims unless we find that judgment to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Munn v. Secretary of Dep't of Health & Human Servs., 970 F.2d 863, 870 (Fed.Cir.1992).
 
 
 8
 The issue presented here is one of statutory construction. The Hodges argue that Congress made no distinction between an HHC which precedes death and one which occurs as part of the agonal (dying) process. Clearly an HHC or death following HHC is compensable; thus, argue the Hodges, Kara's symptoms--pale, unresponsive, and in cardiovascular and respiratory arrest--evidenced a compensable HHC because they are among the statutory indicia of HHC listed in Sec. 300aa-14(b)(1).
 
 
 9
 HHS contends that death is only compensable if it is a sequela of a table injury. See Sec. 300aa-14(a)(I)(E). Thus, death alone is not compensable if a table injury has not been established, regardless of the interval between vaccination and death. Symptoms which are consistent with HHC but are also part of death do not on these facts establish an HHC that is a table injury.
 
 
 10
 The statute requires and this court has determined that the Hodges must show that Kara's death was a sequela of a table injury under Sec. 300aa-14(a)--in this case, an HHC. See Hellebrand v. Secretary of Dep't of Health & Human Servs., 999 F.2d 1565, 1569-70 (Fed.Cir.1993) (citing 42 U.S.C. Sec. 300aa-14(a)(I)(E)). Although the symptoms of her death are among the statutory indicia of HHC listed in Sec. 300aa-14(b)(1), these symptoms do not independently establish an HHC that is a table injury. Id., at 1570. As was said in Hellebrand, "[p]etitioners' argument yields a result (compensation for all SIDS deaths occurring within 72 hours of vaccination) which is at odds with the plain language of the Act. The argument must be rejected." Id., at 1571.
 
 
 11
 The Hodges also contest the determination on actual causation. They argue that their experts' opinions proved actual causation, and that the absence of a specific cause of death (other than SIDS, which is by definition unexplained death) should have weighed in favor of actual causation. HHS responds that the Hodges were required to prove a logical sequence of cause and effect, and that the absence of an alternative cause of injury does not meet the affirmative duty to show causation. We agree with HHS.
 
 This court has said previously that
 
 12
 a proximate temporal association alone does not suffice to show a causal link between the vaccination and the injury. To prove causation in fact, petitioners must show a medical theory causally connecting the vaccination and the injury. Causation in fact requires proof of a logical sequence of cause and effect showing that the vaccination was the reason for the injury. A reputable medical or scientific explanation must support this logical sequence of cause and effect.
 
 
 13
 Grant v. Secretary of Dep't of Health & Human Servs., 956 F.2d 1144, 1148 (Fed.Cir.1992) (citation omitted); see also Jay v. Secretary of Dep't of Health & Human Servs., 998 F.2d 979, 984 (Fed.Cir.1993).
 
 
 14
 The only medical theory put forth by petitioners was that Kara's death was caused by a reaction to endotoxin in the vaccine. The special master found that the medical evidence of record failed to support that theory. Using the highly deferential standard of review mandated by the Vaccine Act, 42 U.S.C. Sec. 300aa-12(e)(2)--arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law--the CFC found nothing arbitrary and capricious in the special master's findings.
 
 
 15
 The dissent argues forcefully that there should have been a more compassionate response to the tragic case before us, and suggests ways that could have been done. One need not be unsympathetic to that view to observe that missing from the dissent's argument is any statutory authority to support a different outcome.
 
 
 16
 Congress in the Vaccine Act provided two bases upon which a petitioner may obtain compensation for a vaccine injury to a child. (For a detailed description of the complex statutory framework, see Munn v. Secretary of Dep't of Health & Human Servs., 970 F.2d 863, 865-66. (Fed.Cir.1992)) One route is easy, as far as evidentiary proof goes. Bring the case within the timetable and specifications of a Table Injury and the statute does the heavy lifting--causation is conclusively presumed. Failing that, the heavy lifting must be done by the petitioner, and it is heavy indeed. Given the statutory burden of persuasion placed upon the petitioner, 42 U.S.C. Sec. 300aa-13(a)(1), and the general state of medical knowledge about the causes of infant illness and death, it is not surprising that petitioners have a difficult time proving cases such as this.
 
 
 17
 Congress assigned to a group of specialists, the Special Masters within the Court of Federal Claims, the unenviable job of sorting through these painful cases and, based upon their accumulated expertise in the field, judging the merits of the individual claims. The statute makes clear that, on review, the Court of Federal Claims is not to second guess the Special Masters fact-intensive conclusions; the standard of review is uniquely deferential for what is essentially a judicial process. See Munn, 970 F.2d at 870. Our cases make clear that, on our review of the judgment of the Court of Federal Claims, we remain equally deferential. Id.; see also Phillips v. Secretary of Dep't of Health & Human Servs., 988 F.2d 111, 112 (Fed.Cir.1993). That level of deference is especially apt in a case in which the medical evidence of causation is in dispute.
 
 
 18
 Here, the Special Master found the petitioner's evidence of causation unpersuasive. There is nothing in the case to suggest that the Special Master failed to comprehend the value or effect of the medical evidence.[4] The fact that the opinion of petitioner's doctors was rejected does not mean that the Special Master was demanding scientific certainty; he might simply have been demanding some degree of acceptable scientific support when concluding that the Hodges' claim for causation in-fact was not supported by a preponderance of the evidence.[5]
 
 
 19
 The dissent describes at length a number of studies which, it is suggested, point in the direction of support for petitioner's case. How much of that, if any, was put before the Special Master by petitioner is unclear. Other studies could be cited that point in the opposite direction.[6] In any event, Congress made clear that the initial decision in these cases was the Special Master's, except that the Court of Federal Claims may in an appropriate case return the matter to the Special Master for additional proceedings. 42 U.S.C. Sec. 300aa-12(e)(2)(C) (1988). In reviewing the judgment of the Court of Federal Claims, as the statute mandates us to do, that is not an option the statute gives us. We must decide the case on the record before us. On the record before us, we find nothing arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law in the CFC's judgment affirming the decision of the Special Master.
 
 
 20
 AFFIRMED.
 
 
 21
 PAULINE NEWMAN, Circuit Judge, dissenting.
 
 
 22
 In the development of legal theory there invariably arise circumstances whereby a routine set of events, pressed to its factual extreme, crosses the threshold separating one body of precedent from another. When the law no longer accommodates experience, reason rebels.
 
 
 23
 Thus we reach the case of Kara Elizabeth Hodges, a healthy infant who at ten weeks of age was inoculated with DPT vaccine. She soon started to cry (described as a painful sound "like two cats fighting"), crying on and off for a couple of hours. Placed in her crib, she appeared to quiet. When observed half an hour later, she was dead.
 
 
 24
 The special master held that it was not proved that the vaccine caused Kara's death. Surely it was not proved to a scientific certainty, for although death is certain enough, certainty in medical causation is less available. I agree that the cause of Kara Hodges' death was not proved beyond scientific doubt. But dead she was, in a sequence that started with the DPT inoculation and ended less than four hours later.
 
 
 25
 The question before the special master was not whether the cause of Kara's death was proved to a medical certainty, but whether causation was established in terms of the standard of proof set in the Childhood Vaccine Injury Act. The special master did not apply the correct standard, and the Court of Federal Claims did not remedy that defect. Thus I must, respectfully, dissent from the affirmance of that decision.
 
 The Standard of Proof
 
 26
 The Childhood Vaccine Injury Act requires that causation be proved by a preponderance of the evidence.[1] The Supreme Court has explained the burden imposed by this standard:
 
 
 27
 The burden of showing something by a "preponderance of the evidence" ... "simply requires the trier of fact 'to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence.' "
 
 
 28
 Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust for Southern California, --- U.S. ----, ----, 113 S.Ct. 2264, 2279, 124 L.Ed.2d 539 (1993) (quoting In re Winship, 397 U.S. 358, 371-72, 90 S.Ct. 1068, 1076-77, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring)) (brackets in original).
 
 
 29
 Thus the burden was upon the petitioner to show that it was more likely than not that the vaccine caused Kara Hodges' death. The special master appears to have confused the clinical standard of medical certainty with the legal standard of evidentiary preponderance. The difference between these evidentiary burdens is significant.
 
 
 30
 The distinction between legal probability and medical certainty did not arise in a medical or a legal vacuum. It has been well explored in tort liability law. See, e.g., Kirschner v. Broadhead, 671 F.2d 1034 (7th Cir.1982) (comparing standards for admissibility of medical opinions between Indiana and federal law). The legislators selected the simple preponderance as the statutory standard of proof for compensation under the Vaccine Program. Congress did not impose a heavier burden on the petitioner than would be encountered in the tort liability litigation that was intended to be replaced with this no-fault compensation procedure.
 
 
 31
 The application of the correct standard in implementing 42 U.S.C. Sec. 300aa-11(c)(1)[2] when the cause of death was not diagnosed to a medical certainty is raised in this case, not for the first time before this court, but most cogently on the facts of Kara Hodges' death. The official diagnosis of the cause of Kara's death was "SIDS". The special master recognized that SIDS, the acronym for "sudden infant death syndrome", is not an illness or injury, but "an idiopathic diagnosis used to describe the otherwise unexplained death of an infant". Hodges v. Secretary of Dep't of Health & Human Services, No. 90-551V, 1991 WL 169397, * 4, 1991 U.S.Cl.Ct. LEXIS 402, * 13 (Aug. 14, 1991). SIDS is neither a cause nor a result. It is an appellation for failure of medical knowledge. Naming a death "SIDS" does not mean that it had no cause; it means that the cause of death was not determined or determinable, to the requisite medical certainty, by the techniques used by the diagnostician.
 
 The Question Presented
 
 32
 The legal question presented under the Vaccine Injury Act, when the cause of death is unknown, diverges from the medical question of what actually caused the death to a medical certainty. Specifically, can Kara Hodges' death be deemed more likely than not to have been caused by the vaccine, when no specific cause of death was diagnosed? When applied to Kara Hodges' death, on its particularly compelling facts, the legal question becomes whether a death for which medical science provided no certain diagnosis can ever be deemed to have been, more likely than not, caused by the vaccine.
 
 
 33
 The position of the Department of Health and Human Services is "no-never". That position, which requires that medical uncertainty and diagnostic inadequacy always be resolved against the infant, strains the text of the statute, which contemplates compensation for injury not set forth in the Table. See Sec. 300aa-11(c)(1)(C)(ii)(I), supra note 2. A death so speedy that no Table injury is manifested to the diagnostician is not excluded by the statute.
 
 
 34
 The answer, it seems to me, must be "maybe", depending on the particular facts. The circumstances of the infant's death must be evaluated in accordance with the standard of proof set by the Act. Such evaluation requires careful consideration of the epidemiology of DPT inoculation--an epidemiology still developing, as experience continues to be accumulated.
 
 
 35
 The answer to the question of causation in a particular case may also benefit from the application of statistical methods, for when the requisite standard of proof is no more than the simple "more likely than not", techniques of probability analysis may be useful despite a relatively low confidence level because of the sparseness of data. See generally Neil B. Cohen, Confidence in Probability: Burdens of Persuasion in a World of Imperfect Knowledge, 60 N.Y.U.L.Rev. 329 (1985); David H. Kaye, Is Proof of Statistical Significance Relevant?, 61 Wash.L.Rev. 1333 (1986).
 
 
 36
 The case of Kara Hodges occupies a precedential framework that illustrates the fact-dependence of the question of causation:
 
 Precedent and the Surveillance Reports
 
 37
 Federal Circuit precedent on undiagnosed infant death following inoculation is sparse. In Hellebrand v. Secretary of Dep't of Health and Human Services, 999 F.2d 1565 (Fed.Cir.1993), Lacey Hellebrand died between seven and fifteen hours after inoculation with DPT vaccine. The death was reported as SIDS. Petitioners' medical witness testified that in his opinion the vaccine caused Lacey's death, either directly or as a sequela to an anaphylactic shock or hypotonic-hyporesponsive shock collapse. The government's medical witnesses testified that there was insufficient evidence to establish that the death was due to any of the causes proposed by petitioners. On appeal to the Federal Circuit the petitioners concentrated on the Table injury issue; this court affirmed the special master's ruling that a Table injury had not been proved.
 
 
 38
 In Jay v. Secretary of Dep't of Health and Human Services, 998 F.2d 979 (Fed.Cir.1993), Matthew Jay died eighteen hours after receiving the DPT vaccine. The death was reported as SIDS. Petitioners' medical witness testified that in his opinion the vaccine caused Matthew's death by an encephalopathy. The special master denied compensation, holding that neither a Table injury nor causation had been proved. The Federal Circuit reversed, holding that on the facts of this case, including the absence of rebuttal evidence by the government, a reasonable person could conclude only that an encephalopathy more likely than not occurred and that the DPT vaccine more likely than not caused the death. The court noted that nothing precludes the fact of death from being used by a medical expert as some evidence of a Table injury (encephalopathy) or of causation in fact.
 
 
 39
 In the case of Kara Hodges, the major factual difference from Hellebrand and Jay is that the elapsed time between inoculation and the reported SIDS death was three to four hours. The Hodges' medical experts testified that in their opinion the vaccine caused Kara's death, and that a hypotonic-hyporesponsive shock collapse occurred or that endotoxins in the vaccine caused the death. The government's witness pointed out that there was no evidence of these events. I shall discuss this evidence in greater detail. However, I stress that the time between vaccination and death is not irrelevant to the analysis, for some epidemiologic studies suggest that the probability of a causal connection is greater as the time between vaccination and death is shortened. For example, the Surveillance Reports issued by the Department of Health and Human Services show the following numbers of "unexplained" deaths reported following DPT vaccination:
 
 
 40
 Days After Number of Unexplained Deaths[3]
DPT Vaccin. 1979-82 1982-84 1985-86
Within 1 day 20 21 31
 2-7 days 15 12 35
 8-13 days 5 6 13
14-20 days 2 2 9
21-30 days 2 - 9
 
 
 41
 Centers for Disease Control, United States Department of Health and Human Services, Adverse Events Following Immunization Surveillance Report No. 1, 1979-1982, Table 7A (1984); Surveillance Report No. 2, 1982-1984, Table 7A (1986); Surveillance Report No. 3, 1985-1986, Table 11B (1989). The Department of HHS declined to draw conclusions from these data, criticizing the reporting methodology as voluntary and incomplete, and pointing out that the total numbers of deaths are smaller than HHS' estimate of the numbers of SIDS deaths occurring at random in the infant population. Report No. 1 at 66; Report No. 2 at 67.
 
 
 42
 The relatively small numbers indeed reduce the confidence level of conclusions that may be drawn, for changes in small numbers can have a relatively large mathematical effect. However, the data are not thereby erased or rendered useless. The confidence to which the data are entitled can be estimated. Even at a relatively low confidence level, trends may be ascertained. The data may support statistical analysis, whereby although the data may not establish a causal relationship to a medical certainty,[4] they may nonetheless meet the more-likely-than-not standard of the law. It was error for the special master to refuse to evaluate Kara Hodges' death on its particular facts and the available evidence, applying the requisite standard of proof.
 
 Principles and Methodology
 
 43
 The special master, refusing to give weight to the epidemiologic evidence and expert testimony presented on behalf of Kara Hodges, erred in his methodology. The special master said:
 
 
 44
 Based on this record, there is not a preponderance of evidence that the DPT vaccine actually caused Kara's death. The only evidence that it may have caused her death is the temporal relationship between the administration of the vaccine and her death, which is insufficient to establish causation.
 
 
 45
 Hodges, 1991 WL 169397, * 4, 1991 U.S.Cl.Ct. LEXIS 402 at * 13-14 (emphasis added). The statute requires, however, that all of the medical evidence be considered:
 
 
 46
 42 U.S.C. Sec. 300aa-13(b) Matters to be considered
 
 
 47
 (1) In determining whether to award compensation to a petitioner under the Program, the special master or court shall consider, in addition to all other relevant medical and scientific evidence contained in the record--
 
 
 48
 (A) any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death, and
 
 
 49
 * * * * * *
 
 
 50
 Any such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court. In evaluating the weight to be given ... the special master or court shall consider the entire record....
 
 
 51
 That it was incorrect to ignore the Hodges' medical experts' testimony and documentary evidence has been reinforced in Daubert v. Merrell Dow Pharmaceuticals, Inc., --- U.S. ----, 113 S.Ct. 2786, 125 L.Ed.2d 469, 27 USPQ2d 1200 (1993), wherein the Supreme Court stressed the obligation of the factfinder to review the scientific reasoning and methodology of the epidemiologic evidence, to evaluate the reliability of the scientific expert opinions, and to weigh the totality of the evidence as applied to the particular case.
 
 
 52
 One of the medical experts for the petitioners, Dr. Geraghty, testified that in his professional opinion endotoxins in the vaccine were the probable cause of Kara's death. This is not a novel theory of vaccine injury. Dr. Geraghty was unable to specify which of the multiple toxic metabolic actions of endotoxin specifically killed Kara, referring to the "primitive autopsies available in these cases"; and on this basis the special master held that this witness' testimony warranted no weight.
 
 
 53
 The other medical expert, Dr. Geier, stated his opinion that the vaccine caused Kara's death. The fourteen attachments to Dr. Geier's affidavit "Relating to DPT and Death" were epidemiologic studies of injury following DPT inoculation, including L.J. Baraff et al., Possible Temporal Association Between Diphtheria-Tetanus Toxoid-Pertussis Vaccination and Sudden Infant Death Syndrome, 2 Ped.Inf.Dis. 7 (1983); S.M. Berg, Neurological Complications of Pertussis Immunization, 5087 British Med.J. 24 (July 5, 1958); T.M. Pollock and J. Morris, A 7-Year Survey of Disorders Attributed to Vaccination in North West Thames Region, 8327 Lancet 753 (April 2, 1983); J. Strom, Is Universal Vaccination Against Pertussis Always Justified?, 5207 British Med.J. 1184 (Oct. 22, 1960); K. Kanai, Japan's Experiences in Pertussis Epidemiology and Vaccination in the Past Thirty Years, 33 Japan J.Med.Sci.Biol., 107 (1980); W.B. Bishop et al., Diffuse Vasculitis and Death After Hyperimmunization with Pertussis Vaccine, 274 New England J.Med., 616 (1966). The special master did not mention these studies other than to remark that "He merely attached 14 articles to his affidavit which 'supports that death can be caused by DPT vaccination.' " The master held: "That the DPT vaccine may cause death is not proof that it did in a particular case." I agree. Whether the vaccine was more likely than not to have caused death in a particular case must be decided upon consideration of all the circumstances and the entire record of that case. Epidemiology is an essential part of that record.
 
 
 54
 The special master's analysis failed the statutory mandate of basing its findings "on the record as a whole", 42 U.S.C. Sec. 300aa-13(a)(1), n. 1 supra. The master held, in effect, that since science did not provide a definitive answer to the mechanism of causation, no weight whatsoever would be given to scientific theory or medical opinion as to causation in this case. That is not the correct methodology under the Vaccine Injury Act. Nor is it a correct view of principles and methodology appropriate to scientific proofs in litigation. In Daubert v. Merrell Dow the Court placed emphasis on the judicial inquiry into "principles and methodology", and recognized the important role, in litigation of issues that turn on findings of science-based facts, of the applicable standard of proof. --- U.S. at ----, 113 S.Ct. at 2795-97, 27 USPQ2d at 1205-07.
 
 Scientific Certainty and Legal Probability
 
 55
 In the course of a scientific investigation, a working hypothesis is constantly probed and refined, as data accumulate and alternative theories are either disproved, or adopted as new working hypotheses. Scientific certainty may take decades, or centuries, but along the way the confidence in scientific understanding of the issue under study enlarges with experience. In contrast, an issue in litigation requires resolution on the present state of knowledge. See generally Troyan A. Brennan & Robert F. Carter, Legal and Scientific Probability of Causation of Cancer and Other Environmental Disease in Individuals, 10 J.Health Politics, Policy and Law 33, 39 (1985) ("Given the growth of probabilistic theories in many areas of science, one who is determined to wait for a deductive explanation of a phenomenon may wait forever.")
 
 
 56
 When resolution of a legal issue requires the finding of scientific fact, the trier of fact must assess the methodology on which the scientific evidence and opinion is grounded, and ascertain the weight to which the finding is entitled. Daubert v. Merrell Dow, --- U.S. at ----, 113 S.Ct. at 2797, 27 USPQ2d at 1207. That is, the factfinder must decide the reliability, consistency, and probative value of the scientific evidence, with the guidance of scientific opinion. The text of the Vaccine Act shows that Congress recognized the difficulty of proof of causation of vaccine injury. See 42 U.S.C. Sec. 300aa-11(c)(1)(C)(i), supra n. 2. The statutory standard of a simple preponderance of evidence precludes the imposition of the standard of scientific certainty. See Santosky v. Kramer, 455 U.S. 745, 754-55, 102 S.Ct. 1388, 1395-96, 71 L.Ed.2d 599 (1982):
 
 
 57
 [T]he minimum standard of proof tolerated by the due process requirement reflects not only the weight of the private and public interests affected, but also a societal judgment about how the risk of error should be distributed between the litigants.
 
 
 58
 (citing Addington v. Texas, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979)). Scientists as well as judges must understand
 
 
 59
 the reality that the law requires a burden of proof, or confidence level, other than the 95 percent confidence level that is often used by scientists to reject the possibility that chance alone accounted for observed differences.
 
 
 60
 Science and Technology in Judicial Decision Making, Report of the Carnegie Commission on Science, Technology, and Government (1993) at 28.
 
 
 61
 In making a preponderance of evidence determination under Sec. 300aa-13(a)(1), all of the circumstances must be considered: the infant's state of health before the inoculation; the observed reactions after the inoculation; the quality of the expert opinions; the epidemiology of vaccine response; the length of time between inoculation and death; and possible alternative causes of death. The time between vaccination and death can not be ignored, but must be weighed along with the other evidence.
 
 
 62
 Dr. Geraghty testified as to "a medical theory causally connecting the vaccination and the injury". Grant v. Secretary of Dep't of Health & Human Services, 956 F.2d 1144, 1148 (Fed.Cir.1992). The scientific validity of the theory that endotoxins may be formed and inflict injury was not challenged by HHS. This is not a situation wherein there is no scientifically valid way of connecting the observed facts of inoculation and death. Yet the special master rejected the evidentiary fact of Kara's death within a few hours of inoculation, rejected the opinions of both of the testifying physicians, and did not comment on Kara's previous good health, her observed reaction to the inoculation, or the absence of possible alternative causes intruding within the narrow window of time between Kara's inoculation and her death.
 
 
 63
 As I have remarked, the proffered epidemiologic evidence was not discussed by the special master. Medical opinion is founded on epidemiology. In Heyman v. United States, 506 F.Supp. 1145 (S.D.Fla.1981) the trial judge remarked on "the general inability of a physician to make accurate predictions of causation without at least some reference to epidemiological studies". Id., at 1149. Although the panel majority states that the epidemiologic data do not meet the requirement in Grant that cause and effect must be shown, in Grant this court acknowledged that epidemiologic studies can be probative of causation, and rejected the studies proffered by HHS only because they were of a different combination of vaccines. Grant, 956 F.2d at 1149. In Grant this court referred to the legislative history of the Vaccine Injury Act, as follows:
 
 
 64
 [A petitioner not claiming a Table injury] must affirmatively demonstrate that the injury or aggravation was caused by the vaccine. Simple similarity to conditions or time periods listed in the Table is not sufficient evidence of causation; evidence in the form of scientific studies or expert medical testimony is necessary to demonstrate causation for such a petitioner.
 
 
 65
 Id., at 1147-48 (quoting H.R.Rep. No. 908, 99th Cong., 2d Sess., pt. 1 at 15, reprinted in 1986 U.S.C.C.A.N. 6344, 6356) (second emphasis added). The court in Grant did not rule out reliance on scientific studies and expert testimony. The epidemiologic evidence and medical testimony that the special master relied upon in the case of Scott Grant is of the same kind that the special master declined to consider in the case of Kara Hodges.
 
 
 66
 The evidentiary use of epidemiologic studies is common in liability litigation. See, e.g., Mendes-Silva v. United States, 980 F.2d 1482, 1486 (D.C.Cir.1993) (epidemiologic studies of effects of yellow fever and smallpox vaccines can form basis of expert opinion of causation); Ellis v. International Playtex, Inc., 745 F.2d 292, 305 (4th Cir.1984) (district court erred in excluding epidemiologic data, relevant to proof of causation); Kehm v. Procter & Gamble Mfg. Co., 724 F.2d 613, 617-20 (8th Cir.1983) (epidemiologic studies showing statistical connection between tampon use and toxic shock syndrome admitted for purposes of showing causation). In DeLuca v. Merrell Dow Pharmaceuticals, Inc., 911 F.2d 941, 958-59 (3d Cir.1990) the court held that epidemiologic evidence showing a more than fifty percent chance that the disease was caused by a certain event can prove causation by a preponderance of the evidence. See generally Bert Black & D.E. Lilienfeld, Epidemiological Proof in Toxic Tort Litigation, 52 Fordham L.Rev. 732 (1984).
 
 
 67
 The probability of a certain event occurring, and the confidence level shown by statistical analysis, are the tools of epidemiology. They are also useful tools of the law, for probability analysis is the modern equivalent of the historical assignment of burdens of proof, whether the standard is proof beyond a reasonable doubt, or by clear and convincing evidence, or a mere preponderance of evidence. The standard of a preponderance of evidence in science-based tort litigation was explained by the D.C. Circuit as follows:
 
 
 68
 In a courtroom, the test for allowing a plaintiff to recover in a tort suit of this type is not scientific certainty but legal sufficiency; if reasonable jurors could conclude from the expert testimony that paraquat more likely than not caused Ferebee's injury, the fact that another jury might reach the opposite conclusion or that science would require more evidence before conclusively considering the causation question resolved is irrelevant.
 
 
 69
 Ferebee v. Chevron Chemical Co., 736 F.2d 1529, 1536 (D.C.Cir.), cert. denied, 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984). The court recognized the "irrelevance" of scientific certainty to "more likely than not" causation. Id.
 
 
 70
 Congress observed and deplored the regression into adversary-type litigation that has characterized administration of the Vaccine Injury Act. The intent was not to make proof of causation harder to achieve, under the compensation system of the Vaccine Act, than under the established procedures of tort litigation. The special master erred in failing to consider the epidemiologic evidence, see Daubert v. Merrell Dow, --- U.S. at ---- 113 S.Ct. at 2791-92, 27 USPQ2d at 1202, and in failing to exercise independent judgment upon the entirety of the evidence, applying the correct standard of proof.
 
 The Scientific Evidence
 
 71
 [T]he basic techniques of science are measuring and counting, and the language that best expresses the data gathered by these techniques is the language of numbers.... scientific standards of proof are expressed numerically, stating degrees of probability or confidence, while legal standards of proof are categorical and expressed entirely in verbal terms.
 
 
 72
 Lee Loevinger, Standards of Proof in Science and Law, 32 Jurimetrics J. 323, 333 (1992) (footnote omitted).
 
 
 73
 The epidemiologic literature contains many studies and reports reflecting concern about infant response to pertussis and other vaccines. I have not undertaken to review all of the literature, but note that as early as 1933 there was reported the death of two infants within hours of their second pertussis immunization. T. Madsen, Vaccination Against Whooping Cough, 101 JAMA 187-88 (1933). In 1948 there was reported the deaths of identical twins following a vaccination. J. Werne & I. Garrow, Fatal Anaphylactic Shock: Occurrence in Identical Twins Following Second Injection of Diphtheria Toxoid and Pertussis Antigen, 131 JAMA 730-35 (1946). In 1958 Berg surveyed reports in the literature of 108 cases of reactions to pertussis vaccine; of the fifteen deaths reported, seven deaths were clustered within the twenty-four hours following vaccination. S.M. Berg, Neurological Complications of Pertussis Immunization, 5087 British Med.J. 24 (July 5, 1958).
 
 
 74
 In 1979, speculation about a possible connection between a particular lot of DPT vaccine (lot A) and a series of deaths in Tennessee, five occurring within a day of vaccination, prompted an investigation. The investigators compared SIDS rates following vaccination with lot A with SIDS rates following vaccination with other lots, and concluded:
 
 
 75
 [T]he probability of observing four or more deaths on any single one of the first eight days after the use of lot A was 0.03. This evidence seems adequate to indicate an unusual temporal association between DPT vaccination with lot A and SIDS.
 
 
 76
 R.H. Bernier et al., Diphtheria-Tetanus Toxoids-Pertussis Vaccination and Sudden Infant Deaths in Tennessee, 101 J.Pediatrics 419, 421 (1982).
 
 
 77
 Other studies have shown a clustering of unexplained infant deaths in the day or two following DPT vaccination. Among those finding statistically significant results is an investigation by Baraff et al. of 145 SIDS deaths in Los Angeles in 1979 and 1980. The investigators found the following temporal relationships between vaccination and SIDS:
 
 
 78
 Days from DPT Observed No. Expected No. Statistical
 Vacc. to Death of Deaths of SIDS Deaths Significance
 

L.J. Baraff et al., Possible Temporal Association Between Diphtheria-Tetanus Toxoid-Pertussis Vaccination and Sudden Infant Death Syndrome, 2 Ped.Inf.Dis. 7 (1983). The authors calculated that the number of actual deaths within one day of vaccination, as opposed to the expected number of unexplained deaths in the population, was statistically significant to the 0.0005 level. That is, the probability that the difference between observed and expected death rates was the random result of the particular sample selected was 0.0005, or five in ten thousand.
Walker et al. studied the association between SIDS deaths and immunization at a large health maintenance organization between 1972 and 1983. Of the twenty-three immunized infants among the SIDS deaths, four deaths occurred within three days of vaccination. Walker stated:
The major finding of the present study is an apparent 7.3 fold elevation in the risk for SIDS in the first four days following immunization with DPT in the first year of life.
A.M. Walker et al., Diphtheria-Tetanus-Pertussis Immunization and Sudden Infant Death Syndrome, 77 Am.J.Public Health 945, 947 (1987).
Torch studied seventy instances of infant deaths that were undiagnosed. Two thirds of the dead infants had been vaccinated with DPT. Observing that twenty-six percent of the deaths had occurred within three days after vaccination, Torch concluded:
[T]hese data show that DPT vaccinations may be a generally unrecognized major cause of sudden infant and early childhood death, and that the risks of immunization may outweigh its potential benefits.
W.C. Torch, Diphtheria-Pertussis-Tetanus (DPT) Immunization: A Potential Cause of the Sudden Infant Death Syndrome (SIDS), 32 Neurology A169, A170 (1987).
Other studies did not identify any clustering of deaths immediately following vaccination. For example, in a study of children born in four Tennessee counties between 1974 and 1984, Griffin found no increase in the incidence of SIDS deaths following immunization. M.R. Griffin et al., Risk of Sudden Infant Death Syndrome After Immunization with the Diphtheria-Tetanus-Pertussis Vaccine, 319 New England J.Med. 618 (1987). Indeed, Griffin's data show fewer than the expected number of SIDS deaths during the week following immunization; Griffin suggests the explanation that children are vaccinated when they are in relatively good health and consequently at lower risk for SIDS.
Hoffman et al., in a large study of SIDS risk factors, found no clustering of SIDS deaths following immunization. Howard J. Hoffman et al., Diphtheria-Tetanus-Pertussis Immunization and Sudden Infant Death: Results of the National Institute of Child Health and Human Development Cooperative Epidemiological Study of Sudden Infant Death Syndrome Risk Factors, 79 Pediatrics 598-611 (1987). A study of twenty-six unexplained infant deaths occurring in Sheffield, England in 1979-82 concluded that "immunization is certainly not a major factor in the general aetiology of sudden infant deaths." E.M. Taylor & J.L. Emery, Immunization and Cot Deaths, 8300 Lancet 721, 721 (1982 v. 2). The report stated:
However, in our experience, most unexpected deaths have a multifactorial aetiology and we cannot exclude the possibility of recent immunization being one of several contributory factors in an occasional unexpected infant death.
Id.
The adverse effects of vaccination were reviewed by a Committee of the Institute of Medicine of the National Academy of Sciences, as mandated by the 1986 Act. Pub.L. No. 99-660, Sec. 313(a), 100 Stat. 3781-82 (1986). The Committee recognized that the studies "differ substantially in their estimate of the increased risk in the early postimmunization period," and stated that the studies vary from an "inverse association" to a "significantly elevated risk". Apparently rejecting much of the reported data because of the small size of the sample or for lack of adequate controls, the Committee concluded that "there is no indication of a statistically significant increased risk of SIDS in the early postimmunization period". However, referring to the small size of the total sample of SIDS deaths, the Committee stated that "even with the pooled data, however, a doubling of the risk of SIDS in the period immediately following immunization would have only about a 50 percent chance of being found to be statistically significant".
That is, the Committee observed that the data did not provide statistically significant results, either way. The Committee thus concluded that "the evidence does not indicate a causal relation between DPT vaccine and SIDS". Institute of Medicine, Adverse Effects of Pertussis and Rubella Vaccines 140-41 (1991). That conclusion reflects the standard of the scientific certainty sought by the Committee. However, the Vaccine Act by its terms sets not scientific certainty, but a more-likely-than-not probability as the standard of compensation. The correct standard of proof is not the 95 percent confidence of science, but the >50 percent confidence set by Congress.
I recognize that the small number of deaths makes mathematical correlation difficult. Several investigators have observed that little is known about why some infants react more severely than others. Yet the absence of a definitive scientific explanation does not mean that causation is eliminated as a scientific possibility in particular cases. Indeed, "[t]he committee could not prove the absence of any possibility of an adverse effect caused by vaccine". Institute of Medicine, Adverse Effects of Pertussis and Rubella Vaccines, 34. As discussed by Lee Loevinger, "there is no logically rigorous definition of what a statement of probability means with reference to an individual instance". On Logic and Sociology, 32 Jurimetrics J. 527, 530 (1992).
Thus the correct legal response is to recognize the uncertain state of present diagnostic knowledge, to take cognizance of the range of epidemiologic results that have been reported, and to decide each case on its specific facts, in accordance with the burden of proof set in the statute. In Santosky v. Kramer, 455 U.S. at 754-55, 102 S.Ct. at 1395-96, the Court stated:
The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to "instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication."
(Quoting Addington v. Texas, 441 U.S. 418, 423, 99 S.Ct. 1804, 1807, 60 L.Ed.2d 323 (1979), quoting In re Winship, 397 U.S. 358, 370, 90 S.Ct. 1068, 1076, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring)).
It is a negation of the judicial as well as the scientific search for truth, to hold that because we do not know to a scientific certainty the answer to this question of causation, that the answer is always "no". In the present state of scientific understanding of the circumstances in which a few infants experience adverse reactions[5] to normally safe vaccines, it is inadequate for the decisionmaker to fail to apply the analytic techniques of probability and likelihood, in deciding the particular case on its facts and the available information. The error in Kara Hodges' case lies in the decisionmaker's view that incomplete knowledge means that the more-likely-than-not criterion can not be met.
In order to reach a legal conclusion in this case it may be necessary to reanalyze the epidemiologic data. In Daubert v. Merrell Dow, --- U.S. at ----, 113 S.Ct. at 2791-92, 27 USPQ2d at 1202, the Court held that the district court improperly excluded reanalyzed epidemiologic studies. In DeLuca v. Merrell Dow, 911 F.2d at 945-57, the court discussed the admissibility of reanalyzed epidemiologic studies for purposes of legal sufficiency, recognizing that the results were not probative by scientific standards.
In sum, scientific inability to identify the cause of Kara Hodges' death does not mean that in her case the preponderance of evidence can not support a causal connection to the vaccination. It was error for the special master to refuse to evaluate Kara Hodges' death on its particular facts. I would remand for redetermination on the totality of the evidence, applying the requisite standard of proof.
---------------

1 42 U.S.C. Secs. 300aa-10 to 300aa-34 (1988 & Supp. III 1991).
2 The Claims Court was renamed the Court of Federal Claims on October 29, 1992. Federal Courts Administration Act of 1992, Pub.L. No. 102-572, Sec. 902(a), 106 Stat. 4506, 4516.
3 SIDS is the "sudden and unexpected death of an apparently healthy infant, typically occurring between the ages of three and five months and not explained by careful post-mortem studies." See Hellebrand v. Secretary of Dep't of Health & Human Servs., 999 F.2d 1565, 1566 n. 2 (Fed.Cir.1993) (quoting Dorland's Illustrated Medical Dictionary, 1644-45 (27th ed. 1988).
4 The dissent castigates the special master for refusing to evaluate Kara Hodges' death on its particular facts and the available evidence (slip op. at 8.), and suggests that he gave the petitioner's medical evidence "neither attention nor weight." (Slip op. at 9.) In his opinion, Special Master Baird, in a separate section entitled Actual Causation, discussed the evidentiary standards required in determining whether an illness, injury, or condition was actually caused by a vaccine, and then discussed the evidence presented by petitioner on that point. He considered the testimony and opinions offered by petitioner's witnesses, Drs. Geier and Geraghty, the relevant information from the autopsy report, and the 14 articles that Dr. Geier attached to his affidavit. With regard to the latter, the Special Master noted: "Dr. Geier did not offer any specific support for his opinion [that the DPT vaccine caused Kara's death]. He merely attached 14 articles to his affidavit which 'supports that death can be caused by DPT vaccination.' That the DPT vaccine may cause death is not proof that it did in a particular case." Hodges v. Secretary of Dep't of Health & Human Servs., No. 90-551V, slip op. at 6, 1991 WL 169397 (Cl.Ct.Spec.Mstr. Aug. 14, 1991). Clearly the Special Master evaluated petitioner's evidence, such as it was, in light of the facts of the case. That he judged it to fall short of proving the case by the standard the law requires is not the same as refusing to consider it.
5 "[T]he law's tolerance for pseudoscientific speculation has been rationalized in the name of science itself." Peter W. Huber, Galileo's Revenge--Junk Science in the Courtroom 3 (1991).
6 An Institute of Medicine report found no causal relationship between the DPT vaccine and sudden infant death syndrome (SIDS). See 267 JAMA 392 (1992) (summary of report). A retrospective study of the risk of SIDS according to the length of time since DPT immunization estimated that: the relative risk from 0 to 3 days after DPT immunization was 0.18; from 4 to 7 days, 0.17; from 8 to 14 days, 0.75; and from 15 to 30 days, 1.0. The study included a multivariate analysis controlling for age, sex, race, year, birth weight, and Medicaid enrollment. The authors concluded that the risk of SIDS did not increase after DPT immunization. See 319 New Eng.J.Med. 618 (1988). Note that one interpretation of the results of this study might be that DPT immunization is likely to protect an infant against SIDS. In a report using data from the National Institute of Child Health and Human Development SIDS Cooperative Epidemiological Study, SIDS infants were found to be less likely to have received any DPT immunization. (Only 39.8% of SIDS infants had received at least one DPT immunization compared to 55% and 53.2% of the living control group infants). See 79 Pediatrics 598 (1987).
1 42 U.S.C. Sec. 300aa-13(a) General Rule
(1) Compensation shall be awarded under the Program to a petitioner if the special master or court finds on the record as a whole--
(A) that the petitioner has demonstrated by a preponderance of the evidence the matters required in the petition by section 300aa-11(c)(1) of this title, and
(B) that there is not a preponderance of the evidence that the illness, disability, injury, condition, or death described in the petition is due to factors unrelated to the administration of the vaccine described in the petition.
2 42 U.S.C. Sec. 300aa-11(c). Petition Content
A petition for compensation under the Program for a vaccine-related injury or death shall contain--
(1) ... an affidavit, and supporting documentation, demonstrating that the person who suffered such injury or who died--
(A) received a vaccine set forth in the Vaccine Injury Table ..., [and]
(C)(i) sustained, or had significantly aggravated, any illness, disability, injury, or condition set forth in the Vaccine Injury Table in association with the vaccine referred to in subparagraph (A) or died from the administration of such vaccine, and the first symptom or manifestation of the onset or of the significant aggravation of any such illness, disability, injury, or condition or the death occurred within the time period after vaccine administration set forth in the Vaccine Injury Table, or
(ii)(I) sustained, or had significantly aggravated, any illness, disability, injury, or condition not set forth in the Vaccine Injury Table but which was caused by a vaccine referred to in subparagraph (A)....
3 The time periods covered by the three reports are January 1, 1979 through December 31, 1982; January 1, 1982 through December 31, 1984; and January 1, 1985 through December 31, 1986. Consequently, the 1982 data is represented twice. The Centers for Disease Control explains that the data were included "in provisional form in the first surveillance report and ... in final form in the [second] report." Surveillance Report No. 2 at 1.
4 By "medical certainty" is meant general acceptance by the scientific community. Addington v. Texas, 441 U.S. 418, 430, 99 S.Ct. 1804, 1811, 60 L.Ed.2d 323 (1979) ("Within the medical discipline, the traditional standard for 'factfinding' is a 'reasonable medical certainty.' ") For statistical data, this means that the results are statistically significant at the confidence level normally required for scientific acceptance and publication in a scientific journal--usually about 0.95. A statistical finding at this level of confidence has a 5 percent (0.05) chance of indicating a relationship which does not in fact exist (a "type I" error). However, the probability of such a study failing to detect a relationship which does in fact exist (a "type II" error) is usually much greater, especially with small sample sizes. The complement of the probability of committing a type II error is called the "power" of the study. See generally Institute of Medicine, Adverse Effects of Pertussis and Rubella Vaccines 56-57 (1991).
5 The government's brief in Hellebrand listed nineteen cases that had been suspended in the Office of Special Masters wherein the cause of death was reported as SIDS.