Rebecca Ellen GOLUB, by and through her parents and next friends, Ralph J. and Adrienne M. GOLUB, Petitioners,

v.

SECRETARY OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.

No. 90–3437V.

United States Court of Federal Claims.

Aug. 30, 1999.

Ronald C. Homer, Boston, Massachusetts, for petitioners.

Claudia Barnes Gangi, with whom were, Frank W. Hunger, Assistant Attorney General, Helene M. Goldberg, Director, John Lodge Euler, Deputy Director, and Gerard W. Fischer, Assistant Director, Washington, D.C., for respondent.

*OPINION*

ANDEWELT, Judge.

I.

In this vaccine action, petitioners, Ralph J. and Adrienne M. Golub, seek compensation under the National Childhood Vaccine Injury Act of 1986 (the Vaccine Act), 42 U.S.C. §§ 300aa–1 *et seq.* (1994), for injuries their daughter Rebecca allegedly suffered as a result of a diphtheria-pertussis-tetanus (DPT) vaccination and/or an oral polio vaccination (OPV) administered on September 14, 1972. Petitioners allege that one or both of these vaccinations caused Rebecca to suffer from Hemophilus Influenza Type B(HIB), which in turn caused her to suffer from a seizure disorder, developmental delay, and cortical damage. The special master assigned to review the petition denied compensation on the ground that petitioners had failed to satisfy their burden of proof. Thereafter, petitioners filed in this court a motion for review of the special master's decision. For the reasons set forth below, this court affirms the special master's denial of compensation.

## II.

There is no dispute as to the background facts set forth in the special master's decision. Rebecca was born on July 14, 1972. At her one- and two-month checkups, she was assessed as a healthy child, and on September 14, 1972, received her DPT vaccination and OPV. On the morning of September 18, 1972, Rebecca began to feed poorly. The very next day, Rebecca became lethargic and experienced a temperature of 104.8F. On September 20, 1972, Rebecca's pediatrician referred her to Children's Hospital Medical Center where doctors noted that Rebecca had a "bulging fontanelle and a stiff neck." Tests of Rebecca's spinal fluid detected the capsular antigen of HIB and confirmed that Rebecca was suffering from meningitis. Rebecca was immediately hospitalized and placed on high doses of Ampicillin and Decadron. Despite treatment, Rebecca experienced generalized seizures, shock, and disseminated intravascular coagulation, i.e., internal blood clotting. Rebecca responded slowly to therapy with Ampicillin and ultimately was discharged from the hospital on October 21, 1972. Rebecca currently suffers from a seizure disorder, developmental delay, and cortical damage.

## III.

During the hearing before the special master, the parties presented conflicting expert testimony. Petitioners' expert, Dr. Leon D. Sabath, testified that the DPT vaccination and OPV more likely than not caused Rebecca's HIB and resulting seizure disorder, developmental delay, and cortical damage. Dr. Sabath presented a theoretical basis for vaccinations causing HIB and then concluded that the vaccinations Rebecca received on September 14, 1972, in fact caused her condition. Dr. Sabath theorized that vaccinations function as antigens which lower the body's immune system for approximately two weeks, a process to which Dr. Sabath referred as "antigen-induced, transient immunosuppression of the immune system." Dr. Sabath explained that children who are "colonized," with HIB at the time they receive a vaccination can enter into a state of hypersusceptibility due to their lowered immune system which can result in a fulminant HIB infection that otherwise never would have occurred.

To support his theory that vaccinations can suppress an individual's immune system, Dr. Sabath relied upon various studies which are summarized in detail in the special master's decision. Certain of these studies involved tests performed on laboratory animals, some of which revealed that the DPT vaccination or components of the pertussis vaccination can impair the ability of an animal's immune system to respond to new disease. Another study involved human testing and was conducted to determine whether patients with AIDS were at risk when receiving blood transfusions. The study involved administering tetanus taxoid immunizations to healthy persons, the result of which demonstrated a decrease in the individuals' T-cells, i.e., cells that help resist infection. Dr. Sabath also relied upon an article that showed that if the first antigen presented to an individual is a disease, such as measles, the immune system's ability to respond to a second antigen is impaired. This article, however, was written in German and petitioners did not provide the special master with a translated copy. Finally, Dr. Sabath relied upon his own unpublished abstract in which he examined 123 children admitted to two hospitals with the diagnosis of purulent meningitis. Dr. Sabath ultimately found a statistically significant correlation between DPT vaccinations and the onset of meningitis in children under the age of six months.

Applying this theory to Rebecca's case, Dr. Sabath testified that Rebecca was a normal child who, although asymptomatic, was already carrying a benign form of HIB at the time she received the vaccinations. According to Dr. Sabbath, only after alteration of Rebecca's defenses against infectious challenge could the HIB infection have occurred. Dr. Sabath testified that there were only two possible factors that could have changed Rebecca's immune system to permit her to become infected. The first possibility is the antigen in the DPT vaccination and the second is some other antigen that was introduced through contact with another person. Based on the testimony of Rebecca's mother, Adrienne Golub, that Rebecca was not in day

care at the relevant time, but rather stayed at home with her mother and two siblings, Dr. Sabath opined that the possibility of Rebecca becoming infected through community contact was small. Therefore, Dr. Sabath concluded that the antigen presented in the routine DPT inoculation more likely than not compromised Rebecca's immune system and caused her to become infected with HIB.

In response, defendant's expert, Dr. W. Paul Glezen, refuted both Dr. Sabath's general theory of HIB infection by vaccination and his conclusion regarding the cause of Rebecca's condition. Dr. Glezen concluded that there is no evidence of increased risk of developing HIB for a child who has recently had a DPT vaccination. In fact, Dr. Glezen referenced a study that showed that the DPT vaccination actually provides protection against invasive bacterial disease such as HIB. Dr. Glezen testified that Rebecca's illness was typical for an infant of her age and that the risk of HIB or any bacterial meningitis is much greater in young infants. Dr. Glezen explained that "the occurrence of bacterial meningitis in this age group is sufficient to cause [HIB]. And there is no reason to hypothesize that it had to be enhanced by any sort of mechanism because I know that serious and fatal infections occur in children who have had no vaccine."

Dr. Glezen relied upon several articles to support his theory that there is no significant relationship between the receipt of immunizations, including DPT, and the risk of invasive bacterial disease such as HIB. One of the studies upon which he relied analyzed whether children hospitalized with a primary diagnosis of infection were more likely than matched controls to have had a DPT immunization within the thirty days before hospitalization. The study found no association between DPT inoculations and subsequent hospitalizations for infectious disease. Another study evaluated children who had received DPT vaccinations and subsequently were hospitalized for episodes of invasive bacterial infections. The study revealed that the DPT vaccination is not followed by a significant increased risk of serious bacterial infection. Finally, Dr. Glezen relied upon a study that involved 186 children who had been diagnosed with HIB or streptococcus pneumonia after receiving a DPT vaccination and a control group of 186 healthy children. The study showed that "no consistent relationship could be demonstrated between DPT immunizations and susceptibility to infectious disease."

Dr. Glezen also addressed the studies upon which Dr. Sabath relied and took the position that many of these studies did not involve either the DPT vaccination or the OPV and, therefore, are not relevant to the instant action. Dr. Glezen asserted that the study Dr. Sabath referenced involving AIDS is not relevant because AIDS is viral and HIB is bacterial. Dr. Glezen found the studies involving laboratory animals to be irrelevant to Rebecca's case because animal models are not directly applicable to human disease. In response to Dr. Sabath's abstract, Dr. Glezen stated that the study was flawed because it compared the interval between the time the subjects were immunized and the time they were hospitalized for some other condition, which, according to Dr. Glezen, has no relevance to the instant case.

Dr. Glezen explained the origins of Rebecca's infection in a different way than Dr. Sabath. Dr. Glezen opined that Rebecca may have been born with a very low level of antibody and was susceptible to the infection because any maternal antibody probably had dissipated by the time Rebecca was two months old. The occurrence of the infection therefore would have coincided with the natural disappearance of the protective antibody in Rebecca's blood. Dr. Glezen concluded that this natural process of antibody dissipation, and not the DPT vaccination or OPV, more likely than not caused Rebecca's HIB.

## IV.

In concluding that petitioners had failed to meet their evidentiary burden of establishing causation in fact and therefore are not entitled to compensation, the special master relied upon *Grant v. Secretary of the Department of Health & Human Services,* 956 F.2d 1144 (Fed.Cir.1992), which summarized a petitioner's burden to prove causation in fact as follows:

[A petitioner] must show a medical theory causally connecting the vaccination and the injury. Causation in fact requires proof of a logical sequence of cause and effect showing that the vaccination was the reason for the injury. A reputable medical or scientific explanation must support this logical sequence of cause and effect.

*Id.* at 1148 (citation omitted); *see also Hodges v. Secretary of the Dep't of Health & Human Servs.,* 9 F.3d 958, 961 n. 4 (Fed.Cir. 1993) (evidence that a vaccine may cause injury is not proof that it did in a particular case). In applying *Grant* to the instant case, the special master imposed a two-step analysis: first, whether the DPT vaccination and/or OPV *can* cause a state of hypervulnerability to HIB; and second, if these vaccinations can, whether they *did* cause Rebecca to become susceptible to and suffer from HIB. Ultimately, the special master found that petitioners had failed to meet the requirements of the first step of the *Grant* test.

The special master in effect adopted the approach to the evidence proffered by Dr. Glezen. Although Dr. Sabath was able to provide a "plausible" medical theory causally connecting the vaccinations and Rebecca's injury, the special master found the evidence in support of Dr. Sabath's theory either irrelevant or unpersuasive. *Golub v. Secretary of the Dep't of Health & Human Servs.,* No. 90-3437V, slip op. at 10 (Fed.Cl. Mar. 30, 1999). The special master agreed with Dr. Glezen that the studies involving laboratory animals are not directly applicable to human disease and that the study involving AIDS is not convincing because AIDS is viral and HIB is bacterial. As to Dr. Sabath's unpublished abstract, the special master used *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), as a framework for evaluating the reliability of such scientific evidence. The special master gave little weight to the study because it was unpublished, not subjected to peer review, and not shown to be generally accepted in the medical community. *See id.* at 2797. The special master characterized Dr. Glezen's opinion as more convincing and found that Dr. Glezen presented credible testimony and literature refuting Dr. Sabath's theory

that vaccinations can cause individuals to become more susceptible to HIB.

The special master further determined that even if petitioners had succeeded in proving that vaccinations can cause individuals to become more susceptible to HIB, petitioners still would have failed to meet the requirements of the second step of the *Grant* test because they failed to show by a preponderance of the evidence that the DPT vaccination and OPV caused Rebecca to become susceptible to, and suffer from, HIB. No tests were conducted on Rebecca and no biological markers were present that could show that the DPT vaccination and/or OPV caused Rebecca to enter a state of hypervulnerability to HIB. Further, to the extent that there was any medical evidence to suggest that Rebecca suffered from a depressed immune system, petitioners failed to convince the special master that this hypervulnerability was the result of Rebecca's exposure to the vaccinations. Contrary to Dr. Sabath's opinion that Rebecca's exposure to other antigens was minimal, and therefore the DPT vaccination is the only antigen that could have suppressed Rebecca's immune system, the special master found that Rebecca could have been exposed to other antigens from her parents, her siblings, or the general public. Without any direct medical evidence, petitioners were unable to prove by a preponderance of the evidence that the vaccinations caused Rebecca to become susceptible to HIB. Based upon this failure to prove by a preponderance of the evidence that the vaccinations both could have and in fact did cause Rebecca's injuries, the special master denied petitioners compensation under the Vaccine Act.

### V.

In this case, the special master essentially was faced with conflicting expert testimony and simply found the testimony of one expert to be more credible and convincing than the other. Petitioners make a number of different arguments why the special master should have given more weight to Dr. Sabath's testimony and the studies upon which Dr. Sabath

relied and less to Dr. Glezen's testimony,[1] and in effect ask this court to reweigh the testimony and studies proffered by the two sides. Such a request, however, extends beyond the limited function this court has in reviewing decisions by a special master in a case brought under the Vaccine Act.

■ Under the Vaccine Act, this court may set aside a special master's findings of fact or conclusions of law only if the court determines that the findings or conclusions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 300aa–12(e)(2)(B) (1994). Determinations of the weight and credibility of evidence are in the special province of the trier of fact and will not be reversed unless they lack rationality. *See Munn v. Secretary of the Dep't of Health & Human Servs.*, 970 F.2d 863, 870, n. 10 (Fed.Cir.1992); *Hines v. Secretary of the Dep't of Health & Human Servs.*, 940 F.2d 1518, 1528 (Fed.Cir.1991) ("If the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate."); *Hambsch v. Dep't of Treasury*, 796 F.2d 430, 436 (Fed. Cir.1986) ("credibility determinations ... are virtually unreviewable"). In *Hines*, the Court of Appeals for the Federal Circuit explained the arbitrary and capricious standard as follows:

> [Petitioner's] contentions are essentially that various pieces of evidence should have been given more or less weight by the special master. Such arguments as to the weighing of evidence, particularly where, as here, witness credibility is involved, do not demonstrate reversible error. Regardless of whether the Claims Court, or we, would have found different facts on a retrial of the case, the issue which the Claims Court resolved and which we now review is only whether the findings and conclusions of the special master were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

*Hines*, 940 F.2d at 1527 (quoting 42 U.S.C. § 300aa–12(e)(2)(B) (1994)).

■ This court has reviewed the testimony of Dr. Sabath and Dr. Glezen and the various studies upon which they relied. The court finds that the special master's decision demonstrates that she reviewed, considered, and weighed the testimony and supporting evidence of each party. In her decision, the special master discussed the pertinent expert testimony and explained in detail the basis for her evidentiary findings and conclusions. The court concludes that the special master's explanation is reasonable and, hence, must affirm the special master's conclusions.

## VI.

Next, petitioners contend that the two-step *Grant* test for causation as applied by the special master required a level of proof that exceeds "a preponderance of the evidence" and instead amounts to "incontrovertible proof." Pet'r's Mot. for Review at 5. Petitioners' argument focuses on the second step of the special master's application of the *Grant* test relating to whether, assuming a viable scientific theory for vaccine causation of the injury exists, that theory could properly be said to apply to and underlie Rebecca's condition. Petitioners argue that the approach the special master employed would render recovery highly unlikely because it would require throat cultures, laboratory tests, and immunoassays both before the vaccination and again after the infection occurred, as well as inoculating healthy infants with bacteria to see if they develop meningi-

---

1. For example, petitioners support the value of animal studies as presented by Dr. Sabath and criticize the special master for adopting certain subsidiary conclusions offered by Dr. Glezen. Petitioners ·also dispute Dr. Glezen's qualifications as an expert witness and contend that it was an abuse of discretion for the special master to have given weight to the following "outrageous" assertions by Dr. Glezen:

> 1. Lab tests showed her immune system to be functioning properly. There were many po-

lymorphonuclear cells, the phagocytes that fight infection, present in Rebecca's spinal fluid and so I think the fact that she survived is because she was able to mount a good response to this infection by putting many polymorphonuclear cells into the spinal fluid which those cells, of course, engulf the bacteria and hopefully kill them.

2. The vaccines actually enhanced Rebecca's immune response, thereby saving her life.

tis after vaccination. Because these tests are virtually never performed on healthy infants, petitioners contend that this standard likely could never be met.

It is not necessary, however, for this court to address petitioners' arguments regarding the second step of the *Grant* test because the court affirms the special master's decision that petitioners have failed to meet the requirements of the first step. Unless petitioners can demonstrate a viable scientific theory of causation, they cannot prevail. For the reasons set forth above, petitioners have failed to demonstrate such a theory here.[2]

## VII.

Finally, petitioners contend that the special master erred in denying petitioners an opportunity to take discovery concerning the removal of an immunomodulating agent known as adenylate cyclase from the pertussis vaccine at some point after Rebecca's inoculation. Petitioners became concerned that this removal may have been the result of unpublished research studies that show the deleterious effects of vaccines on hyper-vulnerability to infection. Petitioners claim that the special master erred by never responding to petitioners' request for discovery.

The Vaccine Act places all discovery within the discretion of the special master. Section 300aa–12(d)(3)(B) of the Vaccine Act provides that "[t]here may be no discovery in a proceeding on a petition other than the discovery required by the special master." 42

U.S.C. § 300aa–12(d)(3)(B) (1994); *see also* RCFC App. J, Rule 7 ("There shall be no discovery as a matter of right."). Hence, the issue becomes whether the special master abused her discretion and acted in an arbitrary and capricious manner in not granting discovery. The court cannot conclude that the special master so acted. Petitioners had ample opportunity to present their theory through selecting an expert, reviewing all published literature on the issue, and cross examining the opposing expert. The special master reasonably could view this extensive available information as sufficient for petitioners to present their theory of antigen-induced immunosuppression, and it was not necessary for the special master to require the Department of Health and Human Services to search for additional unpublished materials, the existence of which is uncertain.

### *Conclusion*

For the reasons set forth above, this court affirms the special master's March 30, 1998, decision denying compensation. The Clerk of the Court shall enter judgment accordingly.

IT IS SO ORDERED.

---

**2.** In *Hodges*, the Federal Circuit characterized the significant burden on a petitioner in seeking to prove causation in fact, as follows:

Congress in the Vaccine Act provided two bases upon which a petitioner may obtain compensation for a vaccine injury to a child.... One route is easy, as far as evidentiary proof goes. Bring the case within the time table and specifications of a Table Injury and the statute does the heaving lifting—causation

is conclusively presumed. Failing that, the heavy lifting must be done by the petitioner, and it is heavy indeed. Given the statutory burden of persuasion placed upon the petitioner and the general state of medical knowledge about the causes of infant illnesses and death, it is not surprising that petitioners have a difficult time proving cases such as this.

9 F.3d at 961 (citation omitted).