**1144**

James L. GRANT, Individually and as Guardian of Scott Grant, an incompetent, and Marjorie A. Grant, Petitioners–Appellees,

v.

SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent–Appellant.

No. 91–5035.

United States Court of Appeals, Federal Circuit.

Feb. 25, 1992.

William Dobreff, Dobreff & Dobreff, Warren, Mich., argued, for petitioners-appellees.

Jonathan R. Siegel, Dept. of Justice, Washington, D.C., argued, for respondent-appellant. With him on the brief were Stuart M. Gerson, Asst. Atty. Gen. and Barbara C. Biddle.

Before LOURIE, Circuit Judge, SKELTON, Senior Circuit Judge, and RADER, Circuit Judge.

PER CURIAM.

The Secretary of the Department of Health and Human Services (Secretary) appeals the judgment of the United States Claims Court granting James and Marjorie Grant, on behalf of their son, Scott Grant, compensation under the National Vaccine Injury Compensation Program. The Claims Court upheld the Chief Special Master's determination that the Grants proved by a preponderance of the evidence that the Quadrigen vaccine actually caused Scott's injuries. *Grant v. Secretary of the Dep't of Health & Human Servs.*, No. 88–70V (Cl.Ct. Aug. 29, 1990). This court affirms.

## BACKGROUND

Scott Grant was born prematurely on June 4, 1961. He was delivered by caesarean section at 31 weeks gestation and weighed 3 pounds 8½ ounces. Scott suffered from several problems commonly associated with premature infants. Nonetheless, he progressed very well. By his August 10, 1961 check-up, Scott already weighed 8 pounds 13 ounces.

On October 5, 1961, Scott received his first inoculation of diphtheria, pertussis, tetanus and polio vaccines (combined in the Quadrigen vaccine manufactured by Parke-Davis). On November 4, 1961, Scott received his second inoculation. After each of the first two vaccinations, Scott's crying increased and he seemed more irritable.

On December 7, 1961, Scott received his final inoculation. At that time, Dr. Weatherhogg, Scott's treating pediatrician, recorded that Scott "now weigh[s] in the range of what a full term baby might weigh." However, because of Scott's irritability, Dr. Weatherhogg increased Scott's dosage of phenobarbital elixir.

Mrs. Grant testified that on the morning of December 8, 1961, Scott emitted an "unbelievable scream" for approximately five minutes. She picked up Scott and felt him "quivering." In detailed and thorough fact finding, the Claims Court discounted this testimony. In particular, the Claims Court noted that contemporaneous medical records did not corroborate Mrs. Grant's account. These records report nothing about a scream and place the first overt seizure ten days after administration of the vaccine.

Dr. Weatherhogg did not see Scott again until January 25, 1962. At that time, Dr. Weatherhogg noticed abnormalities in Scott's development. He diagnosed Scott as having an exaggerated moro reflex, hyperkinesia and headlag. Further tests diagnosed Scott as suffering from "infantile myoclonic seizures" and "hypsarrhythmia." Dr. Weatherhogg referred Scott to the Mayo Clinic for other tests.

At the Mayo Clinic, Scott's treating doctors were Drs. Keith and Millichap. These doctors diagnosed Scott with retardation in mental and motor development, visual impairment, and infantile spasms or myoclonic jerks with atypical hypsarrhythmia. Dr. Millichap recommended treatment with adrenocorticotropic hormone. This therapy was completed March 1, 1962. After the treatment, the seizures ceased. After a second treatment Scott suffered a permanent spastic diplegia rendering him fully dependent on his parents. At the time of this suit, Scott was in his thirties.

After Congress enacted the Vaccine Act, the Grants brought proceedings in the Claims Court. The Chief Special Master initially determined that the Grants did not show either an injury from the vaccine within the Act's time table or an injury actually caused by the vaccine. The Chief Special Master recommended denial of compensation. Due to the Secretary's untimely submission of evidence, the Claims Court remanded.

At a new hearing, the Chief Special Master took additional evidence. This evidence included depositions from Drs. McLean and Gagewski about the unique dangers of Quadrigen. In addition, Drs. Geraghty and Thoman submitted affidavits based on their examination of Scott's medical records.

On the basis of a considerable volume of new evidence, the Chief Special Master reaffirmed that the Grants did not prove an injury on the Vaccine Injury Table. 42 U.S.C. § 300aa–14 (1988 & Supp. I 1989). However, the Chief Special Master determined that the Grants' new evidence showed actual causation. In particular, the Chief Special Master relied on new evidence showing Quadrigen's propensity to cause myoclonic seizures, encephalopathies, and other neurological insults in infants. The Claims Court adopted the Chief Special Master's recommended compensation award. The Secretary appeals.

## OPINION

### Standard of Review

Under *Hines v. Secretary of the Dep't of Health & Human Servs.*, 940 F.2d 1518, 1524 (Fed.Cir.1991), this court reviews "*de novo* the Claims Court's determination as to whether or not the special master's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

### Table Injury

The National Childhood Vaccine Injury Act, 42 U.S.C. §§ 300aa–1 through 300aa–34 (1988 & Supp. I 1989), established the Compensation Program. The Vaccine Act authorizes compensation to a petitioner if the court finds on the record as a whole—

(A) that the petitioner has demonstrated by a preponderance of the evidence the matters required in the petition by section 300aa–11(c)(1) of this title, and

(B) that there is not a preponderance of the evidence that the illness, disability, injury, condition, or death described in the petition is due to factors unrelated to the administration of the vaccine described in the petition.

42 U.S.C. § 300aa–13(a)(1). Section 300aa–11(c)(1) requires the petitioner to show that the victim either sustained an injury set forth in the Injury Table or "sustained ... [an] injury, or condition not set forth in the Vaccine Injury Table but which was caused by a vaccine." 42 U.S.C. § 300aa–11(c)(1)(C)(ii)(I). Petitioners must show by a preponderance of the evidence either that they sustained a Table Injury or that the vaccine in fact caused their injury.

To show a Table Injury, petitioners must show that the victim sustained an injury listed on the Table within the Table's prescribed time limits. 42 U.S.C. § 300aa–14. Thus, if petitioners show by a preponderance that a victim received a listed vaccine

and sustained a listed injury within a listed time frame, the Act authorizes compensation, as long as "there is not a preponderance of the evidence that the . . . injury . . . is due to factors unrelated to the administration of the vaccine. . . ." 42 U.S.C. § 300aa–13(a)(1)(B).

■ The Vaccine Table, in effect, determines by law that the temporal association of certain injuries with the vaccination suffices to show causation. The Table replaces traditional tort standards of causation in fact with a causation in law based on temporal association. The House Committee on Energy and Commerce explained:

The Committee recognizes that there is public debate over the incidence of illnesses that coincidentally occur within a short time of vaccination. The Committee further recognizes that the deeming of vaccine-relatedness adopted here may provide compensation to some children whose illness is not, in fact, vaccine-related. The Committee anticipates that the research on vaccine injury and vaccine safety now ongoing and mandated by this legislation will soon provide more definitive information about the incidence of vaccine injury and that, when such information is available, the Secretary or the Advisory Commission on Childhood Vaccines (discussed below in Section 2119) may propose to revise the Table, as provided below in Section 2114. Until such time, however, the Committee has chosen to provide compensation to all persons whose injuries meet the requirements of the petition and the Table and whose injuries cannot be demonstrated to be caused by other factors.

H.R.Rep. No. 908, 99th Cong., 2d Sess., pt. 1, at 18 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6344, 6359.

■ In this appeal, the Claims Court adopted the revised findings and conclusions of the Chief Special Master. The Special Master found:

[P]etitioners have not demonstrated that Scott suffered a Table injury within the prescribed time periods. Therefore, petitioners are not entitled to a presumption of causation.

*Grant v. Secretary of Dep't of Health & Human Servs.*, No. 88–70V, 1990 WL 293410 (Cl.Ct. Jul. 13, 1990). Despite Mrs. Grant's testimony that Scott suffered his first seizure the day following the vaccination, substantial record evidence supports the Chief Special Master's finding. Contemporaneous medical records do not include any mention of a seizure immediately after the vaccination. As the findings state, "[i]t simply is inconceivable that this event went unreported to doctors treating Scott for his injuries." *Id.* In fact, in a civil proceeding before the filing of this case, Dr. Millichap's deposition placed Scott's first seizure ten days after the inoculation.

In sum, the Chief Special Master took extensive testimony on the timing of Scott's first seizure. The Chief Special Master also devoted careful attention to the contemporaneous medical records. The Chief Special Master set forth and examined this evidence in great detail in his findings and conclusions, which were later adopted by the Claims Court. This court discerns nothing arbitrary, capricious, or unlawful in the finding that Scott did not suffer his injury within the time limits prescribed in the Vaccine Table.

### Causation in Fact

The Vaccine Act distinguishes Table Injuries, which presume causation, from injuries requiring proof of causation by the vaccine. Section 300aa–11(c)(1)(C)(i) discusses Table Injuries. Section 300aa–11(c)(1)(C)(ii) discusses injuries requiring proof of causation in fact.

The Act's legislative history explains further the distinction between a Table Injury and causation in fact. The House Committee on Energy and Commerce stated:

If the petitioner sustained or had significantly aggravated an injury not listed in the Table, he or she may petition for compensation. If the petitioner sustained or had significantly aggravated an injury listed in the Table but not within the time period set forth in the Table, he or she may petition for compensation. In both of these cases, however, the *peti-*

*tion must affirmatively demonstrate that the injury or aggravation was caused by the vaccine.* Simple similarity to conditions or time periods listed in the Table is not sufficient evidence of causation; evidence in the form of scientific studies or expert medical testimony is necessary to demonstrate causation for such a petitioner. (Such a finding of causation is deemed to exist for those injuries listed in the Table which occur within the time period set forth in the Table.)

H.R.Rep. No. 908, 99th Cong., 2d Sess., pt. 1, at 15 (1986) (emphasis added), *reprinted in* 1988 U.S.C.C.A.N. 6344, 6356. The Act relaxes proof of causation for injuries satisfying the Table in § 300aa–14, but does not relax proof of causation in fact for non-Table Injuries.

■ Temporal association of the onset of injury with the vaccination alone establishes legal causation for a Table Injury. Temporal association is not sufficient, however, to establish causation in fact. In another case involving medical proof of causation in fact, a United States Court of Appeals stated:

> [T]he inoculation is not the cause of every event that occurs within the ten day period.... Without more, this proximate temporal relationship will not support a finding of causation.

*Hasler v. United States,* 718 F.2d 202, 205 (6th Cir.1983), *cert. denied,* 469 U.S. 817, 105 S.Ct. 84, 83 L.Ed.2d 31 (1984). Moreover, similarity of a petitioner's injury to those listed on the Table does not show causation in fact. Encephalitis, seizure disorders, and the other Table injuries can have causes other than the administration of a vaccine.

■ When a petitioner relies upon proof of causation in fact rather than proof of a Table Injury, a proximate temporal association alone does not suffice to show a causal link between the vaccination and the injury. To prove causation in fact, petitioners must show a medical theory causally connecting the vaccination and the injury. *Id.* at 205–06. Causation in fact requires proof of a logical sequence of cause and effect showing that the vaccination was the reason for the injury. A reputable medical or scientific explanation must support this logical sequence of cause and effect. *Id.;* 42 U.S.C. § 300aa–13(a)(1).

■ The Chief Special Master made the following findings and conclusions:

> The standard under the Vaccine Act is a preponderance of the evidence. Petitioners have established a logical sequence of cause and effect between the vaccine and the injuries. The unrebutted evidence shows that the Quadrigen vaccine with its pertussis component can cause the symptoms exhibited by Scott.... On balance, it is clear that a preponderance of the evidence supports a finding that the vaccination caused Scott's injuries.

(Footnote omitted.)

The Secretary contends that the Chief Special Master improperly weighed the evidence to reach this conclusion. Specifically, the Secretary faults the weight which the Chief Special Master attributes to the testimony of experts and treating physicians. In a case lacking direct evidence of causation, the Secretary asserts that epidemiological evidence indicating a lack of causation should outweigh expert evidence based solely on apparent temporal connection, animal studies, chemical studies, in vitro studies, and unpublished studies. Although the Secretary's proposition has considerable merit, in this appeal the petitioners mustered a preponderance of evidence to show actual causation in the face of weighty epidemiological evidence.

The Secretary's epidemiological evidence is a definitive study by Dr. Mortimer on DPT and Acute Encephalopathies. The study concludes that the overall frequency of infantile spasms in children who receive DPT vaccines is the same as in a control group of children. The study also concludes that children who receive a DPT vaccine are less likely to have spasms between 7 and 28 days after administration of the vaccine. The Secretary concludes that because Scott manifested symptoms 10 days after vaccination, the vaccine could not have caused his injuries. The Secre-

tary also cites other epidemiological studies which tend to show no connection between the DPT vaccine and spasms or encephalopathies.

These epidemiological studies are probative medical evidence relevant to causation. In an analogous case of medical proofs, the United States Court of Appeals for the District of Columbia explained:

chemical, *in vitro,* and *in vivo* [studies] cannot furnish a sufficient foundation for a conclusion that Bendectin caused the birth defects at issue in this case. Studies of this kind, singly or in combination, are not capable of proving causation in human beings in the face of the overwhelming body of contradictory epidemiological evidence.

*Richardson v. Richardson–Merrell, Inc.,* 857 F.2d 823, 830 (D.C.Cir.1988), *cert. denied,* 493 U.S. 882, 110 S.Ct. 218, 107 L.Ed.2d 171 (1989). These epidemiological studies, however, are not dispositive of the actual causation question in this case.

The Act requires the Claims Court and special masters to consider—in addition to all other relevant medical and scientific evidence contained in the record—

(A) any diagnosis, conclusion, medical judgment ... which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death, and

(B) the results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions.

42 U.S.C. § 300aa–13(b)(1). Thus, the Vaccine Act specifically permits consideration of the types of evidence the Special Master considered in this case.

Despite the considerable weight due to epidemiological studies in the absence of direct evidence of actual causation, the epidemiological studies cited by the Secretary in this appeal related to a general DPT vaccine, not the Quadrigen vaccine. With respect to Quadrigen, the Chief Special Master found:

Most persuasive, however, was the evidence that pertussis as part of the Qua-

drigen vaccine has a heightened potential to cause serious harm.

. . . .

The overwhelming evidence supports a finding that Quadrigen is capable of causing exactly the symptoms that occurred to Scott....

Thus, the Chief Special Master gave great weight to testimony about the uniqueness of Quadrigen. The testimony showed that Quadrigen uses preservative agents which increase the tendency of the endotoxins associated with the pertussis bacteria in the vaccine to detach themselves from the bacteria's cellular structure thereby causing neurological damage.

Thus, the Chief Special Master did not rely on expert testimony based on temporal association and studies of less direct relevance. Instead the Chief Special Master relied on a preponderance of relevant scientific and medical evidence about the particular nature of Quadrigen. This court discerns nothing arbitrary, capricious, or unlawful in that reliance.

## Alternative Etiologies

■ As a precondition to compensation, the Vaccine Act requires, in addition to a Table Injury or causation in fact, the absence of alternative causes. 42 U.S.C. § 300aa–13(a)(1). A successful showing of legal causation or causation in fact does not end the question. The fact-finder must also determine that "there is not a preponderance of the evidence that the ... injury ... is due to factors unrelated to the administration of the vaccine." *Id.* Moreover this finding must not be "based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion." *Id.*

The Vaccine Act expressly separates the inquiry for alternative etiologies from the inquiry for causation. These are two separate inquiries under the statute. Thus, the Vaccine Act clarifies that evidence showing an absence of other causes does not meet petitioner's affirmative duty to show actual or legal causation. Moreover, the Act re-

quires a finding on both causation and alternative etiologies.

■ In this appeal, the Chief Special Master stated:

> Having found that the vaccine caused Scott's injuries necessarily precludes a finding that the injuries were due to unrelated factors.

The Chief Special Master did not stop with that finding, but correctly proceeded to consider and reject evidence about alternative causes:

> Therefore, what follows is an explanation of why infantile spasms was rejected as a cause of Scott's injuries.

This court discerns nothing arbitrary, capricious, or unlawful in the findings on this question.

## CONCLUSION

The Chief Special Master and the Claims Court determined that the Grants produced a preponderance of evidence to show actual causation. In addition, the Chief Special Master and the Claims Court determined that there is not a preponderance of the evidence that Scott's injury is due to factors unrelated to the vaccine. The Secretary did not demonstrate any arbitrariness, capriciousness, or unlawfulness in the findings of fact and conclusions of law. Accordingly, the judgment is

AFFIRMED.

RADER, Circuit Judge, concurring.

The court, in its opinion, reached a result in which I concur. I would reach that result, however, by application of a different standard of appellate review.

The Vaccine Act authorizes a Special Master to issue a decision on petitions for compensation under the Vaccine Program. 42 U.S.C. § 300aa–12(d)(3)(A). Upon review, the Claims Court may: (1) uphold the Special Master's factual findings and legal conclusions, 42 U.S.C. § 300aa–12(e)(2)(A), see also, 42 U.S.C. § 300aa–12(f); (2) set aside the Special Master's decision as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own factual findings and legal

conclusions, 42 U.S.C. § 300aa–12(e)(2)(B); or (3) remand to the Special Master, 42 U.S.C. § 300aa–12(e)(2)(C).

The Vaccine Act then authorizes a party "aggrieved by the findings or conclusions of the court [to] obtain review of the judgment of the court in the United States court of appeals for the Federal Circuit." 42 U.S.C. § 300aa–12(f). In every event, the Vaccine Act specifically requires this court to review the "findings of fact and conclusions of law" from the Claims Court. 42 U.S.C. § 300aa–12(f). The Claims Court must either "uphold ... and sustain" the Special Master's findings and conclusions, 42 U.S.C. § 300aa–12(e)(2)(A), or "issue its own findings of fact and conclusions of law." 42 U.S.C. § 300aa–12(e)(2)(B). In either event, those "findings of fact and conclusions of law of the United States Claims Court" become the "final determinations of the matters involved." 42 U.S.C. § 300aa–12(f). Thus, this court in every vaccine case reviews "the findings or conclusions of the [Claims] court." 42 U.S.C. § 300aa–12(f). This court does not review directly the findings and conclusions of a special master.

According to the language of the Vaccine Act, this court—unlike the Claims Court—does not engage in review under an arbitrary and capricious standard. This court reviews the Claims Court's decision under the traditional clearly erroneous standard. Thus, this court invariably reviews "the Claims Court's decision for correctness in law, and clear error in its factual findings." *Bunting v. Secretary of Dep't of Health & Human Servs.*, 931 F.2d 867, 871 (Fed.Cir. 1991); 42 U.S.C. § 300aa–12(f); *see also* Fed.R.Civ.P. 52(a) ("Findings of fact ... shall not be set aside unless clearly erroneous....") and *Milliken Research Corp. v. Dan River, Inc.*, 739 F.2d 587, 593 (Fed.Cir. 1984) ("In reviewing any factual findings adopted or made by the district court, we must comply with Rule 52(a).").

In 1989, Congress changed the relationship between the Claims Court and the Office of Special Masters. Before 1989, the Special Masters proposed findings of fact and conclusions of law for considera-

tion by the Claims Court. 42 U.S.C. § 300aa–12(c)(2) (1988). The 1989 amendment instead authorized the Special Masters to "issue a decision ... as to whether compensation is to be provided under the Program and the amount of such compensation." 42 U.S.C. § 300aa–12(d)(3)(A). The Special Master's decision must include "findings of fact and conclusions of law." 42 U.S.C. § 300aa–12(d)(3)(A)(i). Thus, instead of receiving proposals from the Special Master, the Claims Court now receives a decision in the form of findings and conclusions. Upon receipt of the Special Master's decision, the Claims Court may adopt its findings and conclusions, set aside its findings and conclusions and substitute the court's own findings and conclusions, or remand to the Special Master. 42 U.S.C. § 300aa–12(e)(2).

The 1989 amendments also contained a standard for the Claims Court to determine when to set aside the Special Masters' findings and substitute its own. Thus, the Claims Court only substitutes its own decision when the Special Master's decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* As expressly clarified by 42 U.S.C. § 300aa–12(e), however, this standard only governs the Claims Court's consideration of Special Masters' decisions.

The 1989 amendments did not alter in the slightest this court's consideration of Claims Court's decisions. Congress did not change this court's review for good reason—none was necessary or intended. In every event, this court continued to receive from the Claims Court final findings and conclusions. For this reason, Congress retained intact the language under the heading of "Appeals:"

The findings of fact and conclusions of law of the United States Claims Court on a petition shall be final determinations of the matters involved, except that the Secretary or any petitioner aggrieved by the findings or conclusions of the court may obtain review of the judgment of the court in the United States court of appeals for the Federal Circuit....

42 U.S.C. § 300aa–12(f).

In sum, the 1989 amendments did not alter this court's standard of review in the slightest. This court continues to review final decisions of the Claims Court under the traditional deference standard. *Bunting,* 931 F.2d at 871.