NOTE:  This disposition is nonprecedential.

# United States Court of Appeals
# for the Federal Circuit

---

**TRAMELLA HINTON, AS GENERAL GUARDIAN OF SHAWN'QUAVIOUS A'DREZ HINTON,**
*Petitioner-Appellee*

**v.**

**SECRETARY OF HEALTH AND HUMAN SERVICES,**
*Respondent-Appellant*

---

2023-2161

---

Appeal from the United States Court of Federal Claims in No. 1:16-vv-01140-KCD, Judge Kathryn C. Davis.

---

Decided:  March 11, 2025

---

JENNIFER ANNE MAGLIO, Maglio Christopher & Toale, PA, Sarasota, FL, argued for petitioner-appellee.  Also represented by ANNE TOALE.

ZOE WADE, Torts Branch, Civil Division, United States Department of Justice, Washington, DC, argued for respondent-appellant.  Also represented by BRIAN M. BOYNTON, C. SALVATORE D'ALESSIO, COLLEEN HARTLEY, HEATHER LYNN PEARLMAN.

_____

Before STOLL, CLEVENGER, and CUNNINGHAM, *Circuit Judges*.

STOLL, *Circuit Judge*.

This appeal challenges a single factual finding—that Shawn'Quavious Hinton received an influenza vaccine on December 21, 2015. The Secretary argues that the special master acted arbitrarily and capriciously when she determined that petitioner had proven, by a preponderance of the evidence, that Shawn, in fact, received an influenza vaccine on December 21, 2015. Because the special master's finding is based on evidence in the record and is not wholly implausible, we affirm.

## BACKGROUND

Tramella Hinton, Shawn's mother and natural guardian, alleges that she and Shawn attended a follow-up appointment at the Vidant office of his primary care physician Dr. Gilbert Alligood, on December 21, 2015, for behavioral and sleeping issues. This was Dr. Alligood's last day at this practice. At this appointment, Ms. Hinton alleges that Shawn received an influenza ("flu") vaccination. She alleges that she was in the exam room with Shawn when Dr. Alligood's nurse administered the flu vaccine in Shawn's upper left arm. The clinic's records, however, indicated that Shawn was a "no show" for the appointment on December 21, 2015. *Hinton v. HHS*, No. 16-1140V, 2018 WL 3991001, at *2 (Fed. Cl. Spec. Mstr. Mar. 9, 2018) ("*Order and Ruling on Facts*"). And Shawn's Medicaid and insurance records do not reflect any charges billed for the December 21, 2015 appointment.

In February 2016, Shawn began to suffer from Guillain-Barré syndrome ("GBS"). When Shawn was admitted to a medical center for symptoms related to GBS, his immunization history in the medical records noted that

Shawn was "up to date, did not receive flu vaccine." *Id.* at \*3. A few months later, Shawn attended outpatient rehabilitation. In April 2016, his outpatient rehabilitation records twice "noted that Shawn was being treated after having been hospitalized for [GBS] after receiving a flu shot on December 21, 2015." *Id.* at \*4.

Around the same time, after she retained counsel, Ms. Hinton took several steps to correct Shawn's medical records from the clinic. In April 2016, she filed a formal request with Vidant Health ("Vidant") requesting that the clinic amend its records to indicate that Shawn received a flu vaccination on December 21, 2015. Vidant denied Ms. Hinton's request, noting that the record was accurate and complete. Consequently, she filed a complaint with the U.S. Department of Health and Human Services, Office of Civil Rights ("OCR") regarding Vidant's failure to amend the records. In September 2016, OCR notified Ms. Hinton and Vidant that it was closing Ms. Hinton's case without further action. Subsequently, in October 2016, Vidant informed OCR that it had investigated Ms. Hinton's request, including reviewing medical records of all patients seen by Dr. Alligood on the day of the alleged visit, and found no basis for amendment of the medical records.

In September 2016, Ms. Hinton petitioned for compensation under the National Vaccine Injury Compensation Program ("Vaccine Act"). 42 U.S.C. § 300aa–10, *et seq.* After reviewing the record, which includes medical documentation, Ms. Hinton's phone records, recorded telephone conversations between Ms. Hinton and Dr. Alligood, deposition testimony from Dr. Alligood, and live testimony from Ms. Hinton, the special master found that Ms. Hinton had established adequate proof of vaccination. In her decision, the special master first acknowledged that although Shawn was scheduled for an appointment on December 21, 2015, the records marked him as a "no show," the billing and insurance records did not show a charge for an encounter or vaccination on that date, and two references in

Shawn's hospitalization records indicated he did not receive a flu vaccine. *Order and Ruling on Facts*, at \*10. The special master found Ms. Hinton's testimony "highly credible" because her testimony about the events on December 21, 2015 was "very detailed and credible" and "the actions that Ms. Hinton took and the lengths that she went through to obtain evidence, any evidence that her son was seen on December 21, 2015, are simply not the actions that an individual would take if she did not believe the events occurred as she recalled." *Id.* The special master also emphasized the "two medical record references indicating that Shawn did receive a flu vaccine prior to his onset of GBS," Dr. Alligood's statement "imply[ing] that he saw Shawn in late 2015 before he left Vidant in December 2015," that there "[wa]s no dispute that Shawn had an appointment scheduled for December 21, 2015," that "Shawn was out of school on December 21, 2015 for his Christmas break," and that Ms. Hinton was "not working on that date." *Id.* at \*10, \*11. The special master admitted that while "[t]he circumstances of th[e] case are troubling," "Ms. Hinton has presented barely enough circumstantial evidence" to "establish[] by preponderant evidence that [Shawn] received an influenza vaccination on December 21, 2015 . . . and thus satisfied the burden as to receipt of a vaccine listed on the Vaccine Injury Table." *Id.* (citing *see* 42 U.S.C. § 300aa11(C)(1)(A) and (B)).[1]

---

[1]    This is a so-called "table case." "Congress in the Vaccine Act provided two bases upon which a petitioner may obtain compensation for a vaccine injury to a child . . . . One route is easy, as far as evidentiary proof goes. Bring the case within the timetable and specifications of a Table Injury and the statute does the heavy lifting—causation is conclusively presumed." *Hodges v. HHS*, 9 F.3d 958, 961 (Fed. Cir. 1993). The flu vaccine is listed in the Vaccine Injury Table as known to cause GBS. So, if

Two months after the special master's *Order and Ruling on Facts*, the special master made a ruling on entitlement to compensation. *Hinton v. HHS*, No. 16-1140V, 2018 WL 4391071 (Fed. Cl. Spec. Mstr. May 29, 2018). The special master found that Ms. Hinton "is entitled to compensation." *Id.* at *1. The Secretary appealed the special master's decision on entitlement to the United States Court of Federal Claims ("Claims Court"), which sustained the special master's decision. *Hinton v. HHS*, No. 16-1140, 2023 WL 3815047, at *9 (Fed. Cl. May 15, 2023) ("*Claims Court Decision*").

The Secretary appeals. We have jurisdiction under 42 U.S.C. § 300aa–12(f).

## DISCUSSION

The special master's resolution of the only factual dispute—whether Shawn received an influenza vaccination—turned largely on her decision to credit Ms. Hinton's testimony over the absence of contemporaneous medical records documenting the vaccination. On this factual finding, "judicial review of the special master's decision is very limited." *Lampe v. HHS*, 219 F.3d 1357, 1360 (Fed. Cir. 2000). In a Vaccine Act case, the Claims Court is required to uphold the factual findings of a special master unless those findings are arbitrary or capricious. *See* 42 U.S.C. § 300aa–12(e)(2)(B); *Saunders v. HHS*, 25 F.3d 1031, 1033 (Fed. Cir. 1994); *Munn v. HHS*, 970 F.2d 863, 870 & n.10 (Fed. Cir. 1992) (noting that the arbitrary and capricious standard is "well understood to be the most deferential possible"). And we review the Claims Court's determination that the special master's findings of fact were not arbitrary and capricious de novo, effectively, "determin[ing] anew

---

Ms. Hinton can establish that Shawn received the flu vaccine, causation is conclusively presumed and they are entitled to compensation.

whether the special master's findings were arbitrary or capricious." *Lampe*, 219 F.3d at 1360; *see Milik v. HHS*, 822 F.3d 1367, 1375–76 (Fed. Cir. 2016).

While it is difficult for an appellant to satisfy the arbitrary and capricious standard of review with respect to any issue, it is particularly difficult with respect to an issue that "turns on the weighing of evidence" by the fact finder. *Lampe*, 219 F.3d at 1360. Reversible error is "extremely difficult to demonstrate" if the special master "has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision." *Hines ex rel. Sevier v. HHS*, 940 F.2d 1518, 1528 (Fed. Cir. 1991). It is not our role to "reweigh the factual evidence, assess whether the special master correctly evaluated the evidence, or examine the probative value of the evidence or the credibility of the witnesses—these are all matters within the purview of the fact finder." *Porter v. HHS*, 663 F.3d 1242, 1249 (Fed. Cir. 2011). The Vaccine Act makes clear that we do not "second guess" the special master's fact-intensive conclusions that are "based upon [her] accumulated expertise in the field." *Hodges*, 9 F.3d at 961. If the special master's findings are "based on evidence in the record that was not wholly implausible, we are compelled to uphold that finding as not being arbitrary or capricious." *Lampe*, 219 F.3d at 1363.

I

Here, we agree with the Claims Court that the special master's decision was not arbitrary or capricious because her factual findings were based on plausible evidence and inferences. Based on her review of the relevant evidence— the medical records, the medical documentation regarding the December 21, 2015 vaccination, the lack of medical documentation regarding the December 21, 2015 vaccination, Ms. Hinton's phone records, recorded telephone conversations between Ms. Hinton and Dr. Alligood, Dr. Alligood's deposition testimony, and Ms. Hinton's affidavit and live

testimony—the special master found that Ms. Hinton "presented barely enough circumstantial evidence to conclude that Shawn more likely than not" (1) attended his December 21, 2015 appointment and (2) "received the flu vaccine on December 21, 2015." *Order and Ruling on Facts*, at *10. These findings are not based on wholly implausible evidence.

Starting with the special master's finding that Shawn was at the December 21, 2015 appointment, Ms. Hinton's testimony is not implausible. Ms. Hinton "explained that in early 2015, Shawn was experiencing a number of sleeping and behavioral issues," so "she scheduled an appointment for Shawn to be seen by his primary care physician, Dr. Alligood [*sic*] in July 2015." *Id.* at *6. A follow-up appointment was scheduled for August 2015. At that appointment, another follow-up appointment was scheduled for December 21, 2015. "Dr. Alligood's records show that Shawn was scheduled for an appointment on December 21, 2015." *Id.* at *10. Ms. Hinton also testified that "Shawn was out of school on December 21, 2015 for his Christmas break," and that she was "not working on that date." *Id.* at *11.

At the December 21, 2015 appointment, Ms. Hinton stopped at the receptionist's desk to check in with the receptionist, who acknowledged their arrival and stated that someone would be out to see them. Despite this, "Shawn [wa]s marked as a 'no show' for the appointment." *Id.* at *10. It is not implausible that Shawn was incorrectly marked a no-show for the appointment. In fact, Dr. Alligood's deposition testimony bolsters the plausibility of Ms. Hinton's testimony because his description of the check-in procedure is consistent with Ms. Hinton's account. In his deposition, Dr. Alligood described the check-in process for his office: "[I]f an established patient presented to his office for a follow-up visit, it was typical for there to be no formal check-in process. One of his nurses would verbally acknowledge that a patient had arrived and the

patient would be called back to an examining room." *Id.* at *6. Ms. Hinton's detailed account of the December 21, 2015 appointment is also plausible. Ms. Hinton testified in detail about specific conversations with Dr. Alligood concerning Shawn's sleep habits, current medication plan, and Dr. Alligood's impending departure from the medical practice. Ms. Hinton also testified that she "watched as Shawn received his annual seasonal flu vaccination, which was administered in his left upper arm by Dr. Alligood's nurse." *Id.* at *2. Indeed, the special master found this testimony to be "highly credible," in part, because Ms. Hinton "presented, in a very detailed and credible account, her recitation of the events which occurred on December 21, 2015." *Id.* at *10.

To demonstrate that she was present at Dr. Alligood's office for Shawn's appointment, Ms. Hinton also produced her telephone records from December 21, 2015. We agree that "[w]hile Ms. Hinton's telephone records from December 21, 2015, are certainly not definitive proof that she was at Dr. Alligood's office with Shawn on December 21, 2015, the records do provide some support for her claim." *Id.* at *10. The plausibility of Ms. Hinton's testimony is also corroborated by Dr. Alligood's deposition testimony and recorded phone conversations. "Dr. Alligood testified that the last day that he saw patients was December 21, 2015," and "that he recalled seeing Shawn several times in 2015 but he did not recall whether he saw Shawn on December 21, 2015 and he also did not recall whether Shawn received a flu vaccine." *Id.* at *6. From the recorded telephone conversations between Ms. Hinton and Dr. Alligood, it is clear that Dr. Alligood did not remember when he saw Shawn and whether Shawn got the flu shot, but Dr. Alligood did remember seeing Shawn right before he left. Based on this evidence, the special master plausibly concluded that "Dr. Alligood does seem to imply that he saw Shawn in late 2015 before he left Vidant in December 2015." *Id.* at *11. Given that "[t]here is no dispute that

Shawn had an appointment scheduled for December 21, 2015," *id.*, that Shawn was out of school for Christmas break, that Ms. Hinton was not working that day, and that Dr. Alligood implied that he saw Shawn shortly before he left his practice in December 2015, it is not implausible that Shawn attended the December 21, 2015 appointment.

Once the evidence allowed the special master to plausibly find that Shawn attended the December 21, 2015 appointment, plausible evidence supports finding that Shawn received the flu vaccine. With respect to the administration of the flu vaccine, the special master found Ms. Hinton's testimony to be "highly credible" because of her "clear details of the appointment with Dr. Alligood . . . and specific information about the administration of the flu vaccine by Dr. Alligood's nurse to Shawn." *Id.* at *10–11. Again, Dr. Alligood's testimony increases the plausibility of Ms. Hinton's account. When asked whether it was his "custom and practice to offer [his] patients a flu vaccination in the fall," Dr. Alligood testified that "during flu season, flu vaccinations [we]re offered to everyone," and in this instance, "Shawn was recommended to have a flu shot either on October 15, 2015, or thereafter." J.A. 398–99 (131:23–132:9); *see also* J.A. 299 (32:3–19) (Dr. Alligood "encourage[d] all [his] patients to get flu shots . . . every year in the fall or winter"). Dr. Alligood also testified that nurses could administer the vaccine, even "outside of [his] presence." J.A. 297–99 (30:19–32:2). Ms. Hinton's actions following the December 21, 2015 appointment bolster the plausibility of her narrative. In the months following the December 21, 2015 appointment, Shawn developed GBS, and Ms. Hinton attempted to obtain documentation of Shawn's December 2015 flu shot from Dr. Alligood's office:

> [T]he actions that Ms. Hinton took and the lengths that she went through to obtain evidence, any evidence that her son was seen on December 21, 2015, are simply not the actions that an individual would take if she did not believe the events occurred as

she recalled.  In her affidavit, Ms. Hinton details each of the people she contacted and the actions she took to establish that Shawn was seen by Dr. Alligood on December 21, 2015 and that he received a flu vaccination on that day, including:  contacting and appearing in person at Vidant to obtain a copy of Shawn's vaccine record and any records of his visit on December 21, 2015; filing a formal request for an amendment of Shawn's records with Vidant and understanding that a formal investigation would take place into her request; calling and attempting to see Dr. Alligood on many, many instances (Dr. Alligood testified that Ms. Hinton called his office 10–15 times a day); filing a complaint [under] HIPAA [the Health Insurance Portability and Accountability Act] to report a violation of Vidant's record-keeping practices; filing a formal complaint with the Office of Civil Rights; contacting her private insurance company and Medicaid to obtain any documentation regarding the December 21, 2015 visit, and even resorting to recording her telephone conversations with Dr. Alligood. These are actions of a dedicated mother demanding for what she believed was an accurate record for her child.

*Order and Ruling on Facts*, at \*10 (citations omitted).  Further demonstrating that Ms. Hinton's testimony on the vaccine administration is not implausible, "there are two medical record references indicating that Shawn did receive a flu vaccine prior to his onset of GBS." *Id.*  Thus, the special master's finding "as a whole, that the evidence presented by Ms. Hinton satisfies the preponderance of the evidence standard . . . [and] therefore f[ound] that Shawn received a flu vaccination on December 21, 2015," *id.* at \*11, does not rest on evidence that is wholly implausible.

To be sure, there is evidence to suggest that the vaccination did not occur.  But in reaching her decision, the

special master acknowledged both the weaknesses in the evidence supporting Ms. Hinton's claim and the concerns raised by the evidence (or lack thereof) that tended to undermine it. For instance, the special master acknowledged "Dr. Alligood's denial of having a nurse named Lisa, the lack of documentation from any source regarding the December 21, 2015 appointment, and the two notations in the medical records that indicate Shawn may have not received a flu vaccine" as "definitely some questionable occurrences in this case." *Id.* The special master also specifically considered and weighed the conflicting evidence and the absence of evidence. *See id.* at \*2–3 (discussing Dr. Alligood's records and the absence of other records), \*3–6 (February 2016 hospital records and Vidant investigation letter), \*8–9 (cross-examination regarding a "nurse named Lisa" and medical documentation).

We agree with the special master that "[t]he circumstances of this case are troubling," *id.* at \*10, but "[g]iven the exacting 'arbitrary and capricious' standard of review that applies to factual findings in Vaccine Act cases, we accept the special master's weighing of the evidence in this case." *Lampe*, 219 F.3d at 1362. We now turn to the Secretary's specific contentions that the special master's factual findings were wholly implausible and lacked a reasoned basis.

## II

The Secretary asserts that the special master's factual finding that Shawn received a flu vaccination on December 21, 2015, was arbitrary and capricious because (A) the special master's inferences are not plausible and (B) the special master did not articulate a rational basis for her finding.

## A

The Secretary first takes issue with the special master's decision to credit Ms. Hinton's account over certain

conflicting hospital records documenting that Shawn had not received a flu vaccine. That is, the Secretary takes issue with the special master's weighing of the evidence. In the Secretary's view, "this case presents two competing accounts of the medical treatment that [Shawn] received in December 2015 and February 2016." Appellant's Br. 18. One account, "is told by medical providers through documentation of their interactions with [Shawn] and his mother," *id.*, while the second account, "as told by [Ms. Hinton], is in direct conflict with contemporaneous medical documentation and 'deserves little weight'" since "[t]his account relies entirely on the self-interested statements of petitioner that were made in anticipation of litigation." Appellant's Br. 19 (citation omitted).

The special master's decision to credit one account over another, which is at the core of this case, is "virtually unchallengeable on appeal" because this decision is "largely based on [her] assessments of the credibility of the witnesses and the relative persuasiveness" of the evidence in this case. *Lampe*, 219 F.3d at 1362. Reaching this decision is the unenviable job of the special master. They must sort through these painful cases and judge the merits of the individual claims. Where, as here, we conclude the special master's weighing of the evidence is not arbitrary or capricious, it is not our job to second guess these fact-intensive conclusions. *Hodges*, 9 F.3d at 961.

Still, the Secretary argues that "crediting petitioner's account of what transpired on December 21, 2015, necessarily compels" a series of wholly implausible inferences. Appellant's Br. 22–23, 25. These implausible inferences include:

(1) that Dr. Alligood and his staff failed to follow legally mandated procedures for documenting a medical encounter and obtaining authorization to administer a vaccination to a minor child, (2) that Dr. Alligood's medical staff fabricated a phone

encounter regarding a prescription refill two days after the prescription had been refilled during an office visit, (3) that a separate medical provider erroneously documented [Shawn's] vaccination status at a time when that information was highly relevant to his evaluation and treatment for GBS, and (4) that the Medicaid office responsible for [Shawn's] benefits recorded but then mysteriously removed information in its system about a charge for a flu vaccination on December 21, 2015.

Appellant's Br. 25.

We disagree that these inferences necessarily follow from the special master's decision to credit Ms. Hinton's account. For instance, given the clinic's lax check-in procedures for existing patients, it is plausible that Dr. Alligood and his staff incorrectly marked Shawn as a no-show for his December 21, 2015 appointment. Assuming Shawn was inaccurately marked as a no-show, it is plausible to infer that no medical documentation (e.g., Medicaid, insurance or authorization) regarding the vaccination exists because, from the perspective of the medical office, Shawn was not at his appointment. In addition to crediting the testimony of both Ms. Hinton and Dr. Alligood concerning the lax check-in procedures, the special master also heard testimony that could corroborate such a conclusion. For example, Ms. Hinton testified that the nurse "wrote everything down on a piece of paper," but "she never actually went in the computer to enter" that information. J.A. 131. Thus, from this record one could plausibly infer that office procedures were not necessarily followed, and therefore medical documentation might be missing.

These inferences are also unnecessary to the special master's decision. For example, the Secretary goes too far with its contention that by accepting the special master's decision, it necessarily follows that "Dr. Alligood's medical staff fabricated a phone encounter regarding a prescription

refill two days after the prescription had been refilled during" the December 21, 2015 visit.  Appellant's Br. 25.  The phone encounter and December 21, 2015 visit are separate unrelated events.  Whether the special master ultimately believed Ms. Hinton's account of Shawn's prescription refill is immaterial to the special master's decision to credit Ms. Hinton's testimony on the administration of the flu vaccine.

The Secretary's contention that "crediting petitioner's account necessarily compels the conclusion that hospital staff repeatedly inquired whether [Shawn] received a flu vaccination, yet documented petitioner's responses inaccurately" is similarly misplaced.  Appellant's Br. 24.  We see no reason why one could not infer these medical records are inaccurate.  As the special master noted, Ms. Hinton acknowledged these inaccuracies and maintained her position that whenever she was asked, she stated that Shawn received a vaccine in December 2015.  *See* J.A. 147.  We will not revisit the special master's decision to credit Ms. Hinton's account as the most plausible.

B

Next the Secretary argues that "the special master offered no explanation, let alone a rational one, for why she found [Shawn's] medical records were not credible."  Appellant's Br. 31.  The Secretary explains, "the special master made an extraordinary finding that later-in-time statements made in anticipation of litigation (which ordinarily 'deserve little weight') were more persuasive than contemporaneous medical records from multiple providers that negate the existence of the alleged vaccination and are considered 'generally trustworthy.'"  Appellant's Br. 17–18, 31 (citing *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1382–83 (Fed. Cir. 2021)).  In the Secretary's view, "the sole basis for the special master's determination was her conclusion that petitioner was 'highly credible.'"  Appellant's Br. 18 (citing J.A. 36–37).

The Secretary's entire argument is a thinly veiled disagreement with the special master's weighing and resolution of the evidence. We see no basis for finding the special master's weighing of the evidence arbitrary and capricious. As the Claims Court noted, "although the Federal Circuit has recognized the 'unremarkable proposition that it [is] not erroneous to give greater weight to contemporaneous medical records than to later, contradictory testimony,' [we have] not held that crediting credible and corroborated testimony over conflicting or absent contemporaneous records is per se arbitrary and capricious." *Claims Court Decision* at \*9 (first alteration in original) (citing *Kirby*, 997 F.3d at 1382).

Here, as we note above, the special master did provide a rational explanation for her decision. She even acknowledged that there were "questionable occurrences in this case" involving the contemporaneous medical records. *Order and Ruling on Facts*, at \*11. Even so, "in reviewing the facts of this case, the testimony and actions of Ms. Hinton, and the circumstantial evidence," the special master found as a whole "that the evidence presented by Ms. Hinton satisfie[d] the preponderance of the evidence standard" to support a finding that Shawn attended his December 21, 2015 appointment and received the flu vaccine. *Id.* Under our "uniquely deferential" review, we are not free to "second guess" the special master's fact-intensive conclusions. *Hodges*, 9 F.3d at 961. Therefore, we see no reason to disturb the special master's determination.

## CONCLUSION

We have considered the Secretary's remaining arguments and do not find them persuasive. This is a close case. But we cannot say that the special master's decision was so clearly wrong as to be arbitrary or capricious. Therefore, we affirm the special master's decision awarding compensation.

## **AFFIRMED**